(No. 33563.—

Louis E. Wolfson, Appellee, *vs.* Sewell Avery *et al.*, Appellants.

*Opinion filed April 15, 1955—Rehearing denied June 10, 1955.*

MacLeish, Spray, Price & Underwood, of Chicago, (John E. MacLeish, Robert S. Cushman, Joseph W.

TOWNSEND, JESS HALSTED, CLIFFORD C. PRATT, and JOHN F. SWENSON, of counsel,) for appellants.

MAYER, FRIEDLICH, SPIESS, TIERNEY, BROWN & PLATT, of Chicago, (LEO F. TIERNEY, EDMUND A. STEPHAN, ROBERT L. STERN, STUART BERNSTEIN, DWIGHT W. FAWCETT, JOSEPH M. GLICKSTEIN, of Jacksonville, Fla., and WILLIAM A. SHEA, of New York, N. Y., of counsel,) for appellee.

HERMAN T. VAN MELL, and FINN & VAN MELL, of Chicago, EDMUND M. COOK, LEWIS D. WILSON, and HAROLD W. HAWES, all of Moline, (SOLLO, GRAHAM & CALIFF, of Moline, and BELL, BOYD, MARSHALL & LLOYD, of Chicago, of counsel,) KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, (WEYMOUTH KIRKLAND and THOMAS M. THOMAS, of counsel,) WILLIAM N. STACK, MILLER, GORHAM, WESCOTT & ADAMS, JAMES B. WESCOTT, ALBERT S. BARNEY, GANN, SECORD, STEAD & McINTOSH, FREDERICK SECORD, and THOMAS W. O'SHAUGHNESSY, all of Chicago, for *amici curiae*.

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

Louis E. Wolfson filed a complaint in the circuit court of Cook County against Montgomery Ward & Company and its directors, seeking a declaratory judgment that section 35 of the Illinois Business Corporation Act, (Ill. Rev. Stat. 1953, chap. 32, par. 157.35,) which purports to authorize the classification of directors into not more than three classes and the election of only one class annually, is unconstitutional and void, and that the company's bylaw adopted pursuant thereto is therefore unlawful. After answer was filed, plaintiff moved for judgment on the pleadings. The court sustained the motion and entered judgment as prayed in the complaint. Defendants appeal directly to this court, on the ground that a construction of the constitution and the validity of a statute are in-

volved. Pursuant to leave heretofore granted, several additional Illinois corporations having classified directors have intervened as *amici curiae* in support of the appeal.

From the allegations of the pleadings admitted by the answer and the motion for judgment, it appears that the board of directors of Montgomery Ward & Company consists of nine members divided into three classes of three directors each. At each annual meeting of the stockholders one class is elected for a term of three years. On August 18, 1954, appellee became the owner of 20,000 shares of common stock. About two months later he sent a letter to appellants asserting that the provision of the bylaws for the election of only one third of the directors each year was unlawful, and demanding the rescission and repeal of that portion of the bylaws relating to the classification of directors and their election for so-called "staggered" terms. Appellee further requested in the communication that the individual appellants forthwith announce to shareholders that at the annual meeting to be held on April 22, 1955, the full membership of the board of directors may be elected to office. After receipt of the letter appellants failed to rescind or repeal the allegedly illegal portion of the bylaws, although they had ample opportunity to do so, and appellee instituted the present action on November 1, 1954.

Section 35 of the Illinois Business Corporation Act, pursuant to which the company's bylaw was adopted, provides as follows: "When the board of directors shall consist of nine or more members, in lieu of electing the whole number of directors annually, the by-laws may provide that the directors be divided into either two or three classes, each class to be as nearly equal in number as possible, the term of office of directors of the first class to expire at the first annual meeting of shareholders after their election, that of the second class to expire at the second annual meeting after their election, and that of the third class, if any, to expire at the third annual meeting after their

election. At each annual meeting after such classification the number of directors equal to the number of the class whose term expires at the time of such meeting shall be elected to hold office until the second succeeding annual meeting, if there be two classes, or until the third succeeding annual meeting, if there be three classes." The sole issue presented by the appeal is whether the classification of directors permitted by the statute, and their election for staggered terms, violate section 3 of article XI of the Illinois constitution, which guarantees to stockholders the right to cumulate their votes in the election of directors.

Under cumulative voting, a method designed to enable minority stockholders to gain representation on the board of directors, each shareholder is entitled to votes equal to the number of his shares multiplied by the number of directors to be elected. He may cast all his votes for a single candidate or distribute them among two or more as he sees fit. It is not disputed that in an election of only three members of a nine-member board, approximately 250 per cent as many votes are required to elect a single director as would be necessary if all nine members were to be elected at the same time. In an election of the full board of nine directors, the owners of 10 per cent of the stock voted, plus one share, could elect one out of the nine directors to be elected. On the other hand, if the board of directors is classified so that only three members are elected each year, it would require 25 per cent of the stock voted, plus one share, to gain a single seat on the board. Where all nine members are elected at once, a minority holding 49 per cent of the stock could elect four; and the majority holding 51 per cent of the shares, by cumulating their votes in the most advantageous manner possible, could elect no more than five out of the nine directors. If only three members of the board are elected each year, however, the holders of 49 per cent would be able to elect only one director at each election, and could never have

more than three directors on the board at one time. Similarly, an owner of 25 per cent of the stock could elect two directors if all nine were chosen at once, whereas under the present bylaw such a shareholder would be unable to elect even one director. It is evident, therefore, that as the number of directors up for election decreases the number of share votes necessary to elect one director increases. (See Williams, Cumulative Voting for Directors, pp. 48-49, Harvard Business School, 1951; Ballantine, A Critical Survey of the Illinois Business Corporation Act, 1 Univ. Chicago L. Rev. 357, 385-386; The Corporate Directorship, National Industrial Conference Board Study No. 63 (1953) p. 12; Note, 66 Harv. L. Rev. 531, 532; Note, 56 Dickinson L. Rev. 330; 27 St. Johns L. Rev. 357, 358-359.) Classification of directors in fact impairs even majority representation by requiring the majority to wait for two or three years before it can secure representation proportional to its strength.

Appellee's position is that since the degree of a minority's representation on the board varies directly with the number of directors to be elected, representation in proportion to its holdings is defeated if the entire board is not elected at one time; and that the purpose of the constitutional provision for cumulative voting in corporate elections is to give minority shareholders the right to proportional representation on corporate boards. The appellants, on the other hand, insist that the purpose of cumulative voting is not to guarantee proportional representation but simply to enable minorities to secure some representation or voice on corporate boards of directors. It is pointed out that a corporation may reduce the number of its directors to three without violating any constitutional or statutory restriction; that in such event the number of shares required to elect a single director would likewise be increased; that the constitution does not require any particular number of directors except that by use of the plural it con-

templates at least two; that the percentage of shares which a minority group must have in order to secure any representation on the board of directors is therefore left to the discretion of the General Assembly; and that since the General Assembly may lawfully provide for corporations with three directors it may also provide for corporations with classified boards of directors with three in each class.

The determination of the issue presented in this case depends upon a proper construction of section 3 of article XI of the constitution, which reads as follows: "The general assembly shall provide, by law, that in all elections for directors or managers of incorporated companies, every stockholder shall have the right to vote, in person or by proxy, for the number of shares of stock owned by him, for as many persons as there are directors or managers to be elected, or to cumulate said shares, and give one candidate as many votes as the number of directors multiplied by the number of his shares of stock shall equal, or to distribute them on the same principle among as many candidates as he shall think fit; and such directors or managers shall not be elected in any other manner."

Although this State and many others have long had both mandatory cumulative voting and permissive classification of directors, no reported decision has been found in which the precise question presented here has been considered. In *Wright* v. *Central California Water Co.* 67 Cal. 532, 8 Pac. 70, a constitutional provision for cumulative voting was held to be violated where a majority of the shareholders approved a resolution to elect the company's seven directors in seven consecutive elections, electing one director at each election. The court observed: "We think the power thus conferred upon a corporate elector can only be exercised, according to the constitutional provision, by allowing him to cast his ballot singly, cumulatively or distributively, at one time, for the election of directors, for if but one director at a time be balloted for,

a majority of the stockholders could, by combining, cumulate their voters each time upon a single candidate and elect him, and by thus shaping and controlling the manner of election it would be in the power of the majority of the stockholders to virtually cancel the votes of the minority and deprive them of their rights to representation on the board of directors." In *People ex rel. Espey* v. *Deneen,* 247 Ill. 289, this court recognized the soundness of the decision in the *Wright case,* saying "there can be no cumulative voting where there is but one officer to elect." The *Deneen case* involved the constitutional provisions of article IV, sections 7 and 8, as to cumulative voting in primary elections for representatives in the General Assembly. The court made this pertinent observation with respect to minority representation: "The constitution guarantees the right of minority representation, and the legislature has no power to pass any law the direct purpose or practical operation of which defeats, abridges or restricts that right." Some aspects of the *Deneen case* were overruled in *People ex rel. Lindstrand* v. *Emmerson,* 333 Ill. 606, but that decision reaffirmed the view that the cumulative voting provisions of the constitution must be construed so that their purpose is not defeated, and that the practical operation of a law must be considered in determining whether it defeats the right of minority representation.

Appellants contend the language of section 3 of article XI does not forbid classification of directors and their election for staggered terms, but plainly contemplates a power in the General Assembly to continue the practice which was well known at the time the constitution of 1870 was adopted. In support of the contention it is argued that since the section gives stockholders the right to vote for as many persons as there are directors "to be elected," it contemplates the possibility that less than the whole number may be elected at any particular annual meeting; and that the construction adopted by the circuit court

renders meaningless the words "to be elected." Appellee takes the position that the words in question are neutral, and were used merely to describe the persons involved in future elections, to make it clear, for example, that if a corporate board is increased or decreased in size the new number is to be chosen rather than the original number. We may say at once that the failure of the convention to expressly forbid classification is not determinative. This court has not heretofore taken so literal an approach to the constitutional provision. Neither the filling of vacancies by directors, nor the issuance of nonvoting stock is expressly forbidden, yet statutes authorizing both practices have been held invalid. (*People ex rel. Weber* v. *Cohn,* 339 Ill. 121; *People ex rel. Watseka Telephone Co.* v. *Emmerson,* 302 Ill. 300.) Nor do we think the words "to be elected" can be given the meaning or significance ascribed to them by appellants. The same phrase appears in sections 7 and 8 of article IV of the constitution, dealing with minority representation in the General Assembly. Thus, after stating that three representatives shall be elected in each senatorial district every two years, these provisions declare that "each qualified voter may cast as many votes for one candidate as there are representatives *to be elected,* or may distribute the same, or equal parts thereof, among the candidates, as he shall see fit." (Emphasis supplied.) Since three representatives must always be elected, the phrase in question was obviously not used in reference to the number of representatives to be elected, and we would not be warranted in attributing a different meaning or intent to the words as used in section 3 of article XI, unless the context so requires. A careful examination of the entire section fails to disclose any indication that the words "to be elected," appearing in the first clause, were intended to imply that less than the entire board could be elected at one time. On the contrary, the second clause of the section, which deals expressly with cumulative voting, indi-

cates rather that all directors must be elected at each regular election. It confers on each stockholder the right "to cumulate said shares, and give one candidate as many votes as the *number of directors* multiplied by the number of his shares of stock shall equal, or to distribute them on the same principle among as many candidates as he shall think fit." (Emphasis supplied.) Appellants argue in effect that the words "candidate" and "candidates" in the second part of the section refer to the office or offices of "directors or managers to be elected," mentioned in the first part of the section, and that the phrase "number of directors" must therefore mean only the number which is to be elected at the particular annual meeting. The argument is not convincing. In our opinion these words should be given their ordinary meaning, namely the whole number of directors of the corporation. In *People ex rel. Watseka Telephone Co.* v. *Emmerson,* 302 Ill. 300, we had occasion to construe the present section of the constitution in deciding whether a corporation could provide for preferred stock without any right in the owner to vote for directors. It was contended that the phrase "every stockholder," as used in section 3, should be construed to mean "every stockholder entitled to vote." It was held, however, that under this provision of the constitution all stockholders must have the right to vote for directors. We observed that "If the convention intended that only those stockholders who were given the right to vote by the charter or articles of incorporation adopted by the company were included it would have been perfectly easy to word this section so as to convey this meaning, but instead of so wording it the convention used the language, 'every stockholder shall have the right to vote, in person or by proxy, * * * for as many persons as there are directors or managers to be elected,' and followed this with a provision as to cumulating said shares." In the case at bar it should likewise follow that since the convention failed to qualify the words

"number of directors," it must have intended their natural meaning as all the directors of the corporation.

Appellants and the *amici curiae* rely upon the rule that any subject of government which is not within some constitutional inhibition may be acted upon by the General Assembly, and that constitutional provisions should be liberally construed in order that the legislative enactment may be sustained. It is true that section 3 says nothing about the number of directors which a corporation must have, except that the use of the plural in connection with cumulative voting implies there must be more than one; that it does not in terms require the whole number of directors to be elected at each regular or annual meeting; and that the classification of directors and their election for staggered terms is not expressly forbidden. It is well settled, however, that prohibitions may be found not only in the language used but also by the necessary implications of such language. The guaranty of minority representation prohibits any law which in effect defeats or nullifies it, even though such law does not in express terms attempt to nullify the right. It is not disputed that staggered elections enlarge the percentage of votes necessary to obtain representation on the board, and may result in excluding any representation for minorities which would otherwise be able to elect a director. It is likewise evident that the classification of directors and their election for staggered terms do not purport to affect the legal right of a stockholder to vote his shares cumulatively, and that the right of cumulative voting does not pretend to assure a minority a representation in any event.

It is true, as defendants urge, that the constitutional provision does not insure a voting strength which is precisely proportionate to stock ownership, and that the actual operation of the provision in a particular situation will depend upon three variable factors: the total number of shares, the number held by the stockholder, and the number

of directors. But these variable factors are inherent in the language of the constitution. Their presence does not, we think, authorize us to sanction the introduction of another variable which is not inherent,—classification of directors by terms.

In determining whether the effect of classification in mathematically increasing the percentage of votes required for representation on the board is a substantial denial of the constitutional right of cumulative voting, it is appropriate to consider the mischief designed to be remedied and the purpose sought to be accomplished by the provision. Since the language to be construed is a constitutional provision, the object of inquiry is the understanding of the voters who adopted the instrument. In this connection it is appropriate to consider the historical background for the inclusion of section 3 and the debates of the members of the convention, as well as explanations of the provision published at the time. As we stated in *Burke* v. *Snively*, 208 Ill. 328, at 344-345: "In construing constitutional provisions the true inquiry is, what was the understanding of the meaning of the words used by the voters who adopted it? Still, the practice of consulting the debates of the members of the convention which framed the constitution, as aiding to a correct determination of the intent of the framers of the instrument, has long been indulged in by courts as aiding to a true understanding of the meaning of provisions that are thought to be doubtful."

The United States Supreme Court employs the same technique in interpreting the Federal constitution. In the words of Chief Justice Marshall, "In expounding them [the words of the Federal constitution], we may be permitted to take into view those considerations to which courts have always allowed great weight in the exposition of laws. The framers of the constitution would naturally examine the state of things existing at the time; and their work sufficiently attests that they did so." The Chief Jus-

tice continued: "Great weight has always been attached, and very rightly attached, to contemporaneous exposition. * * * The opinion of the Federalist has always been considered as of great authority. It is a complete commentary on our constitution; and is appealed to by all parties in the questions to which that instrument has given birth. Its intrinsic merit entitles it to this high rank; and *the part two of its authors performed in framing the constitution, put it very much in their power to explain the views with which its was framed."* (Emphasis supplied.) (*Cohens* v. *Virginia,* 6 Wheat. 264, 416-418; cf. *Transportation Co.* v. *Wheeling,* 99 U.S. 273, 280; *United States* v. *Southeastern Underwriters Ass'n,* 322 U.S. 533, 551.) While there is no such historic source as the Federalist Papers to aid in the interpretation of the Illinois constitution, we do have relevant data in the explanations which appeared in the press.

There was prevailing throughout the 1860's popular indignation at the excesses and frauds of certain railroad managements, and the press was vehement in its denunciation of the "rings" which controlled many of the railroad companies which defrauded minority stockholders. Prior to the Constitutional Convention, the moving force behind the idea of minority representation in political and corporate elections in Illinois was a group known as the Minority Representation Society of which Joseph Medill, publisher of the *Chicago Tribune* and one of the framers of the controverted constitutional provision, was a leading member.

A news item in the *Chicago Tribune* for December 31, 1869, reports the proceedings of the annual meeting of the Minority Representation Society at which Medill stated that he proposed to offer the convention a bill for minority representation, which he referred to as "proportionate representation" and which would not be confined to political matters only but which would include corporate bodies in

which the minority would have their due representation.

Medill became the leading advocate of cumulative voting for both political and corporate elections, and introduced the cumulative voting provision for the election of directors soon after the convention assembled. In May, 1870, the Committee on Miscellaneous Corporations submitted a report recommending the present constitutional language. From the ensuing reported debates the intention of the framers may be gleaned.

Medill himself referred to the provision as proportional representation and in introducing the proposal, stated: "The subject of proportional representation is attracting the earnest and anxious thought of the ablest statesmen and writers in Europe as in America." (Constitutional Debates, pp. 563-564.) In expounding the section he described a system of proportional representation: "Suppose a company with a capital stock of $100,000 elect ten directors. At present, under the ordinary method of electing directors, stockholders holding five hundred and one shares elect the entire board, and those holding four hundred and ninety shares cannot elect a man to represent their interests. After these ten directors are thus elected, they can proceed to create an 'executive committee,' to run the institution, the members of which may not represent a quarter or a fifth of the stock. Thus we have the whole interests of the company controlled by $25,000 or $30,000 of stock. On the plan here proposed the holders of $49,000 by clubbing their votes together could elect four of the ten directors, and if shares to the amount of $10,000 were held by one stockholder he could elect one director to protect his interests." (Constitutional Debates, p. 1666.)

Another delegate, Mr. Coolbaugh, in illustrating the proposal, also described proportional representation and stated: "The principle is precisely this: If I am an individual owner of one third of the capital stock of an incorporation organized for pecuniary profit, it would enable me to have

representation in the board of directors *equal to my interest* in the stock of that corporation. For instance, if a company is organized with a capital stock of $100,000, *with nine directors, and I am the owner of one third of the aggregate capital of that company, I will have the privilege of electing three of those directors, and have an influence on that board of directors equal to my interest in the company.* I can see no wrong in that, but I can see that it is just and fair and equitable, and that it secures, beyond any doubt or peradventure, the interests and rights of minorities in these corporations." (Emphasis supplied.) Constitutional Debates, p. 1667.

Contrary to appellants' interpretation of Medill's position, it is patent from the editorial in the *Chicago Tribune* of May 14, 1870, that he did mean that section 3 of article XI required the whole number of directors to be elected at one time. The editorial states: "In all incorporated companies every stockholder shall have the privilege of voting as heretofore, for as many Directors as are to be elected, or of casting the whole number of his shares, *multiplied by the whole number of Directors,* for any one person, or to otherwise distribute them as he pleases." (Emphasis supplied.)

Other journals throughout the State interpreted the constitutional provision in the same way, and quoted with approval the synopsis of the *Tribune.* The *Carthage Gazette* of May 19, 1870, p. 2, col. 5; *Jacksonville Daily Journal* of May 18, 1870.

An editorial in the *Edwardsville Intelligencer* of June 9, 1870, p. 1, col. 2, stated: "No Constitution has ever been framed in this country, to our knowledge, in which the rights of the people, and not of the majority only, but of a minority, were as thoroughly and fairly guarded. The section providing for [political] minority representation has been much discussed already. * * * The very same principle is carried into the government of all corporations,

so that a minority of stock can always elect a minority of directors proportioned to its strength—a provision which will go far to break up the swindling rings which use so many corporations for their private advantage."

The election at which the constitution was ratified took place on July 2, 1870, and on June 25, 1870, an editorial had appeared in the *Chicago Tribune* further expounding this provision of the constitution: "By the adoption of the section in question, the minority will always be able, by concentrating their votes, to elect as many Directors as their proportion of shares would fairly entitle them to. Thus if a company with a capital of $1,300,000 elects a board of thirteen Directors, the minority, if they control $600,000 of the stock, can elect six of the thirteen Directors. If they control but $100,000 they can still elect one Director to look after their interests in the management of the affairs of the company. The selfishness, rapacity, and mismanagement of corporate bodies and the secrecy, intrigue, and corruption in the proceedings of their officers will receive a healthy and salutary check."

Two days before ratification by the people, another emphatic editorial appeared in the *Tribune* relating to this proposed constitutional provision: "The third clause on 'Corporations' will forever prevent the confiscations of the rights of stockholders by Directors, of which the Erie Railway is a conspicuous and infamous example. * * * Now, if the four-ninths of Erie stock actually held by the opponents of Fisk and Gould, prior to the fraudulent over-issues, had been allowed its fair representation in the Board of Directors, as provided by our new Illinois Constitution, the Gould-Fisk party, instead of electing the whole board, would only have elected five-ninths of them, while the other party would have had immediately four-ninths of them in the Board of Directors, and a minority in the Executive Committee." The article goes on to explain just how this example of proportional repre-

sentation would be effected by the proposed constitution: "This is effected by the clause in our new constitution which provides that 'in the election of Directors of incorporated Companies, every stockholder shall have the right to vote, in person or by proxy, for the number of shares of stock owned by him, for as many persons as there are directors or managers to be elected or to cumulate said votes' and cast them all for one candidate, or to distribute them among as many candidates as he might think fit. This will, at all times, enable the holders of any given minority of the stock to elect a number of Directors proportionate to their number of shares of stock. This clause was first proposed in these columns, and, in view of the great and growing importance of purity and integrity in the management of our railways, and insurance, banking, manufacturing, transporting, and other corporations, we cannot but regard it as one of the most important of all the reforms embodied in the new constitution."

The fact that the constitutional provision does not expressly prohibit staggered elections does not foreclose a construction which invalidates the statute authorizing such elections. The standards which apply in matters of constitutional interpretation have frequently been pointed out by this court. As we observed in *People ex rel. Nelson* v. *Jackson-Highland Building Corp.* 400 Ill. 533, the meaning of constitutional language "can best be ascertained by considering the purposes of the constitutional provision in which it appears" and courts should "construe our constitutional clauses so as to give effect to the spirit in which they were adopted." In *Peabody* v. *Russel,* 301 Ill. 439, we said: "It is a canon of construction well recognized, not only in this court but in courts of other jurisdictions, as it relates to statutes, that the chief purpose is to give effect to the intention of the legislature. In seeking such intention courts are to consider the language used, the object to be attained or the evil to be remedied. This may

involve more than the literal meaning of the words. That which is within the intention is within the statute though not within the letter, and though within the letter it is nevertheless not within the statute if not likewise within the intention. The same general principles to be applied in construing statutes apply in the construction of constitutions." If there is any distinction between the rules governing the construction of constitutions and the rules that apply to statutes, less technical ones are applied in construing constitutions. (*People ex rel. Rogerson* v. *Crawley,* 274 Ill. 139, 142.) A constitutional guaranty should be interpreted in a broad and liberal spirit. Courts should not apply so strict a construction as to exclude its real object and intent. As we have indicated, the general purpose of the provision, as disclosed in the debates of the constitutional convention and in contemporaneous comments and explanations in the press, was to afford a minority protection in proportion to its voting strength. In the light of such purpose and the evil sought to be remedied, the section cannot be construed to authorize a method of selecting directors which results in impairing the value of the right. That section 3 contemplates a right to vote cumulatively for the entire number of directors is also evident from the unqualified nature of its language. The second clause of the section, describing cumulative voting, provides that the stockholder shall be entitled to "give one candidate as many votes as the *number of directors* multiplied by the number of his shares." (Emphasis supplied.) This unqualified reference to "number of directors" on its face means the total number, and nothing in the remaining language of the section requires that it be construed to refer also to a smaller number resulting from classification. It must therefore follow that section 35, which provides for the classification of directors and the election of less than the entire number at any one election, is in conflict not only with the purpose of affording proportional represen-

tation but with the natural effect of the constitutional language as well.

In *People ex rel. Weber* v. *Cohn,* 339 Ill. 121, we considered the validity of a statute providing that the directors shall fill all vacancies which may happen in the board of directors caused by death, resignation or otherwise, until the next annual meeting of the stockholders. In holding the statute to be in violation of section 3 of article XI of the constitution, we observed: "the constitution provides all elections for directors shall be by the stockholders, etc., 'and such directors or managers shall not be elected in any other manner,' while the statute provides that the directors shall fill vacancies which happen in a board by death, resignation or otherwise. The two are inconsistent and cannot both be given effect. The stockholders have a right to direct the affairs of the corporation through directors elected by them, and they cannot be deprived of that right under the constitution." We think a similar conclusion must follow in the case at bar. Section 35 of the Business Corporation Act, in authorizing the classification of directors, is inconsistent with the constitutional right of a stockholder to cumulate his shares through multiplying them by the "number of directors," and cannot be sustained.

Appellants emphasize the long period during which the act has been in effect. Age, however, does not immunize a statute from constitutional attack. This court does not hesitate to invalidate long standing practices under statutes where they are challenged and found offensive to the constitution. In *People ex rel. Weber* v. *Cohn,* 339 Ill. 121, this court held unconstitutional a statute which authorized directors to fill vacancies on boards without any action by the shareholders, notwithstanding the fact that the practice was authorized by the Corporation Act of 1872. In *People* v. *Bruner,* 343 Ill. 146, this court invalidated a statute which had been in effect since 1827, providing that jurors were to be the judges of the law as well as the facts in

criminal cases. More recently, in *Grasse* v. *Dealer's Transport Co.* 412 Ill. 179, this court held unconstitutional a section of the Workmen's Compensation Act. Although it had been in the statute for almost forty years and had been assailed on other grounds many times, it was declared that section 29 deprived workingmen of their constitutional rights and that there must be a determination of its invalidity even though it had been in force for a long time.

Defendants also rely on what they term a long-continued administrative construction of the statute. Even assuming that the views of the officers administering the act were authority for its validity, we cannot regard their failure to challenge the act as an administrative construction, for the reason that officers are not normally expected to question the validity of the legislation under which they act. Cf. *Fergus* v. *Brady,* 277 Ill. 272, 276.

Reliance is also placed upon the fact that a law authorizing classification was passed by the first legislature, and that this legislature included thirteen members who had served in the Constitutional Convention. That is a fact to be given some weight, but it is by no means controlling (cf. *Marbury* v. *Madison,* 1 Cranch. 137,) and in this case it must yield to the evidence supplied by the constitutional debates and the contemporary accounts in the press.

Appellants predict alarming results if this court should rule adversely to their contentions. It appears that there are 1655 domestic corporations whose securities are listed on the major stock exchanges. Only 196, or 11.8 per cent, have classified boards of directors elected for staggered terms. Of this list of 196, 15, or less than one per cent, are Illinois corporations. It further appears that only six out of 65 major retail corporations have staggered boards of directors. Consequently, we do not believe that the disturbance envisioned by appellants will be widespread. Appellants also voice serious misgivings as to the future of corporate life and commercial transactions if classified

boards are held to infringe the constitutional right. These fears are unwarranted. Corporate directors exercising the functions of their office under the color and claim of an election, even though unlawfully elected, are nevertheless *de facto* directors. So far as third parties are concerned, the acts of *de facto* directors are as binding upon the corporation as if the directors were *de jure*. Ballantine on Corporations, sec. 59, p. 149, rev. ed. 1946; Cook, Corporations, 8th ed, 1923, sec. 713, p. 2433.

The circuit court was correct in holding the statute unconstitutional, and its judgment is accordingly affirmed.

*Judgment affirmed.*

Mr. JUSTICE HERSHEY, dissenting:

I dissent from the majority opinion, because I believe it can be demonstrated that the effect of the decision is to judicially amend the Illinois constitution.

The issue in the case is not complex, nor are the determinative principles of law difficult to apply.

Section 35 of the Illinois Business Corporation Act provides that when the board of directors shall consist of nine or more members they may be divided into either two or three classes and elected to staggered terms of office. The sole question is whether section 3 of article XI of the Illinois constitution prohibits such classification and staggering.

Our most basic constitutional law concept is that the Illinois constitution is not a *grant* but a *limitation* of power. (*People* v. *Dale*, 406 Ill. 238, 243; *Gillespie* v. *Barrett*, 368 Ill. 612, 615; 11 I.L.P., Constitutional Law, sec. 33.) For this reason, if our constitution does not prohibit this legislation (no Federal constitutional inhibition being urged) its constitutionality should be sustained.

Thus, the inquiry should be directed toward ascertaining exactly what is prohibited by section 3 of article XI of the Illinois constitution, which reads as follows: "The

general assembly shall provide, by law, that in all elections for directors or managers of incorporated companies, every stockholder shall have the right to vote, in person or by proxy, for the number of shares of stock owned by him, for as many persons as there are directors or managers to be elected, or to cumulate said shares, and give one candidate as many votes as the number of directors multiplied by the number of his shares of stock shall equal, or to distribute them on the same principle among as many candidates as he shall think fit; and such directors or managers shall not be elected in any other manner."

Essentially, this provision expressly prohibits legislation that would (1) deprive a stockholder of the right to vote for directors, (2) prevent voting in person or by proxy, or (3) destroy the right of cumulative voting.

Conversely, the only constitutional guarantees to corporate stockholders are that there must be at least two directors, that stockholders shall have a right to vote in person or by proxy at every corporate election, and that they shall have the right to cumulate their votes.

The use of the plural in connection with cumulative voting implies there must be more than one director. However, the constitution does not otherwise state anything about the *number* of directors which a corporation must have. Indeed, there is a striking absence of any provision either (1) as to how many directors are to be elected, (2) their terms of office, or (3) how frequently they are to be elected. Finally, there is no statement that *all* directors must be elected *at the same time.* Therefore, any prohibition against the classification of directors and their election for staggered terms as set out in this statute must arise, if at all, by implication.

A fundamental canon of statutory and constitutional interpretation is that the primary source for ascertaining the meaning of the provision under consideration is the plain and natural meaning of the language used. (Cooley,

Constitutional Limitations, 7th ed. p. 92; *Graham v. Dye,* 308 Ill. 283, 286; *Gibbons v. Ogden,* 9 Wheat. (22 U.S. 1) 188; *Edwards v. Cuba Railroad,* 268 U.S. 6-8, 631.) Where it is possible, every section and clause must be given effect. If there is apparent conflict, courts should adopt the construction which will render every word operative, rather than one which will make some words idle or nugatory. *People ex rel. Nauert v. Smith,* 327 Ill. 11, 20; Cooley, Constitutional Limitations, 8th ed., p. 128.

Section 3 provides that "every stockholder shall have the right to vote, in person or by proxy, for the number of shares of stock owned by him, for as many persons as there are directors or managers *to be elected,* or to cumulate said shares, \* \* \*." (Emphasis added.)

No significance could be ascribed to the phrase "to be elected" if the entire board of directors had to be elected at one time. Clearly, if section 3 prohibits staggering and requires that every director be elected at the same time, "to be elected" accomplishes nothing. For the same result would be required if the section provided that "every stockholder shall have the right to vote, in person or by proxy, for the number of shares of stock owned by him, for as many persons as there are directors or managers (~~to be elected~~), or to cumulate said shares, \* \* \*."

On the other hand, if section 3 does not contemplate or involve any prohibition of staggering, but affirmatively contemplates the propriety of providing for staggered boards, the words "to be elected" have meaning. They accomplish a purpose and are not surplusage. For in that event they are a recognition that all directors need not be elected at the same time. Thus, every stockholder shall not have the right "to vote for as many persons as there are directors;" rather, he shall have the right "to vote for as many persons as there are directors *to be elected.*"

Nor can the words "to be elected" be disposed of by asserting that they have no reference to a number that

may be elected less than the whole, but merely identify the subject matter with respect to which the right to vote is exercised. For again that is to ascribe no meaning at all to the words. If all directors are to be elected at one time, "directors" identifies the "persons" in respect of whom the voting rights are assured. The addition of the words "to be elected" would then be completely unnecessary to identify the "persons."

The majority point out that the phrase "to be elected" also appears in sections 7 and 8 of article IV of the Illinois constitution, which deal with minority representation in the General Assembly, and cite this usage as an argument in support of the conclusion that these words do not have the meaning or significance ascribed to them by the appellants. Actually, the use of this phrase in said sections 7 and 8 aids the appellants' position. These sections, after providing that *three* representatives shall be elected in each Senatorial District *every two years* state that "each qualified voter may cast as many votes for one candidate as there are representatives to be elected, or may distribute the same, or equal parts thereof, among the candidates, as he shall see fit." Under this language, the intent is clear. *Three* representatives must be elected *every two years,* and a voter can cast three votes for one candidate or distribute them or equal parts thereof among the several candidates if he sees fit. But section 3 of article XI neither fixes the *number* "to be elected" nor the *time* of their election. It would seem most reasonable to deduce from this that the framers of the constitution did not want the same type of protection in article XI as in article IV; hence, all mention of the number "to be elected" was omitted in article XI and said matter was left to the discretion of the legislature.

In another effort to render inoperative the words "to be elected," the majority point to the second part of section 3, which reads: "* * * or to cumulate said shares, and give one candidate as many votes as the num-

ber of directors multiplied by the number of shares of stock shall equal, or to distribute them on the same principle among as many candidates as he shall think fit; and such directors or managers shall not be elected in any other manner." They state that the words "number of directors" must be given their ordinary meaning, that is, the whole number of directors of the corporation.

The error of this conclusion may be shown in several ways.

First, the critical words in the second portion of section 3 are "candidate" and "candidates." Webster's International Dictionary (unabridged,) Second Edition, defines "candidate" as follows: "One who offers himself, or is put forward by others, as a suitable person or an aspirant or contestant for an office, privilege, or honor; as a candidate for governor; a candidate for holy orders." In orders to be candidate for director or manager of a corporation, there must be an *office or offices* which the candidate or candidates are seeking. As applied to section 3, the offices which the candidates seek are the offices of director or manager *to be elected.* Therefore, it is clear that the right of cumulative voting exists only in favor of the number of offices or directors or managers to be filled at that particular election.

Second, the majority's conclusion is predicated upon a confusion of the two separate subjects covered by section 3. As applied to this case, the language deals with two subjects: (1) *whom* the stockholder may vote for, and (2) *how many* votes he may cast. The first of these subjects is defined in plain language, that is, he may vote "for as many person as there are directors or managers to be elected" or he can vote cumulatively for "one candidate" or distribute his cumulated votes "among as many candidates as he shall see fit." The *number* of votes the stockholder may cast is also defined in this section. A stockholder is guaranteed the right to vote "the num-

ber of shares of stock owned by him" or to cast cumulatively "as many votes as the number of directors multiplied by the number of shares shall equal." Since the words "number of directors" appear in that part of the section dealing with the number of votes, it certainly is an unwarranted construction to consider them as providing for the mandatory election of all directors at the same time.

Third, although it is not necessary to prove the point, reference to the constitutional debates makes it clear that the proper interpretation of this portion of section 3 relating to the number of votes which can be cast cumulatively is the product of the number of shares times the number of directors *to be elected.* For example, the following colloquy appears in the debates (Constitutional Debates, p. 1666) : "Mr. Browning: . . . If a shareholder owns ten shares of stock, and there are ten directors to be elected, has he the right to cast one hundred votes, according to the manner in which these things are now regulated—that is, ten votes for each director to be elected?" "Mr. Coolbaugh: I understand he has, or can cast all his votes for one." "Mr. Browning: I made the inquiry because the section provides the number of shares held shall be multiplied by the number of directors to be elected. I did not know whether or not the mode of doing business is to give a man a number of votes equal to the number of shares he holds multiplied by the number of directors to be elected. But that being so, the section is all right as it is."

Fourth, even assuming that the number of votes which a stockholder can cast is the product of the number of shares times the "number of directors" '(*i.e., all* the directors), that would merely increase the voting strength of the minority and the majority proportionately and would not alter the result of the vote in any way. If there be any ambiguity in the formula for computing the number of *votes* that may be cast, resolution of that ambiguity should not be seized upon as an opportunity for writing

into the section a provision on the altogether different subject of the number of *directorships* that must be voted on.

The majority rely upon *People ex rel. Watseka Telephone Co.* v. *Emmerson,* 302 Ill. 300. The issue in that case was whether or not nonvoting preferred stock could lawfully be issued. This court quite properly held that section 3 guarantees a stockholder the right to vote for directors, and, therefore, such nonvoting stock could not lawfully be issued. The question of whether or not the whole number or a lesser number of directors are required to be elected at each annual election was not even considered.

Therefore, I am convinced that from a proper analysis of this constitutional provision it can be conclusively demonstrated that the legislation under review is not unconstitutional. There is no express prohibition in the constitution against the classification and staggering provided for in the statute, nor can any such prohibition be logically implied.

In my opinion, the words of the constitution, when taken in their ordinary signification, embody a definite meaning, which involves no conflict with other parts of the same instrument; therefore, the court should not refer to extrinsic matters to arrive at a proper interpretation. (11 I.L.P., Constitutional Law, section 25.) However, even when use is made of extrinsic matters to aid in arriving at the correct interpretation, it can be shown that the appellants' position should be sustained.

I refer initially to the contemporaneous and long-continued legislative and administrative construction of section 3 of article XI of the constitution which sustains the power of the legislature to provide for classification and election for staggered terms. The construction which the first legislature places upon a constitution is entitled to great weight. (*People ex rel. Badger* v. *Loewenthal,* 93 Ill. 191, 200; *American Aberdeen-Angus Breeders' Ass'n* v. *Fullerton,* 325 Ill. 323; *Cohens* v. *Virginia,* 6 Wheat.

(19 U.S.) 264, 418; *The Laura,* 114 U.S. 411, 416; *Wisconsin* v. *Pelican Ins. Co.* 127 U.S. 265, 297; *Knowlton* v. *Moore,* 178 U.S. 41, 56; *Hampton & Co.* v. *United States,* 276 U.S. 394, 412.) Mr. Justice Marshall, whom the majority also quote, expressed himself as follows in the *Cohens case:* "A contemporaneous exposition of the constitution, certainly of not less authority than that which has been just cited, is the judiciary act itself. We know that in the Congress which passed that act were many eminent members of the convention which formed the constitution. Not a single individual, so far as is known, supposed that part of the act which gives the Supreme Court appellate jurisdiction over the judgments of the state courts in the cases therein specified, to be unauthorized by the constitution."

In the first General Assembly elected following the adoption of the constitution of 1870 were thirteen men who were members of the convention which drafted the constitution. That General Assembly enacted a general corporation act, which provided for both cumulative voting and classification of directors. (Laws of 1871-2, p. 296.) This same General Assembly also passed an act for the incorporation of railroads. (Laws of 1871-2, p. 625.) This act made classification of railroad directors mandatory. They also adopted a building and loan corporation act, which provided for the classification of directors. (Laws of 1871-2, p. 173.)

Moreover, the construction which the first General Assembly placed upon section 3 of article XI as permitting classification of directors continued unchallenged until the instant case, a period of eighty-three years.

Furthermore, since 1870 the Illinois General Assembly has extended the principle of classification and staggered terms to a wide variety of public bodies and commissions. Section 9-33 of the Revised Cities and Villages Act provides for staggered terms for aldermen of cities organized under the Cities and Villages Act adopting the mayor and city

council plan. Such cities are authorized to adopt by referendum a plan of minority representation in the election of aldermen. This plan permits cities to be divided into not to exceed six aldermanic districts, with three aldermen to be elected from each district. Under the plan, the right of cumulative voting is provided for in the election of these aldermen. However, section 9-38 states that even where this system of cumulative voting is adopted, the city council, by ordinance, may continue the system of staggered terms for aldermen by electing aldermen from alternate districts each two years.

Classification and election or appointment for staggered terms is also provided for aldermen, commissioners or trustees of cities and villages which adopt the city manager plan; for county school trustees; for members of the board of education of all school districts (except Chicago) having a population of more than 1,000 inhabitants; for commissioners of all park districts (except the Chicago Park District); for the trustees of the Sanitary District of Chicago; for directors of hospital districts; for directors of city libraries; for directors of libraries in commission form villages; for trustees of fire protection districts; for trustees of mosquito abatement districts; for members of the Illinois Commerce Commission; for members of the Industrial Commission; for trustees of the University of Illinois; for trustees of Southern Illinois University; for trustees of the Teachers' College Board; for trustees of the Judges' Retirement System (other than *ex officio* members); for trustees of the Chicago Police Retirement Board; and for the trustees of the Municipal Employees' Retirement Board (other than *ex officio* members).

So far as I have been able to find, there is no reported case in any court in this country in which the validity of any statute permitting or requiring classification of directors and their election for staggered terms has ever been challenged. The results of a survey made of 51 jurisdic-

tions (the 48 States plus Hawaii, District of Columbia and the Federal government) disclose the following: 36 permit or require classification of directors, and 4 more probably permit such classification and election for staggered terms. Twenty-three jurisdictions have mandatory cumulative voting for directors either by statute or by constitutional provision, and 20 more have permissive cumulative voting if the articles of incorporation so provide. And 13 States have both mandatory cumulative voting and permissive classification of directors. While this does not, of itself, support the constitutionality of this statute, it does show that classification and election for staggered terms is widely prevalent, and the Illinois statute is similar to that in force in the majority of jurisdictions.

Also, the Model Business Corporation Act (Uniform Laws Annotated, vol. 9, p. 52 and following), prepared by the Commissioners on Uniform State Laws and recommended for adoption by the several States, provides both for mandatory cumulative voting (section 28) and permissive classification of directors and their election for staggered terms (section 31). (See also Commissioner's note, p. 117.) Indeed, in a number of instances classification of directors and their election for staggered terms has been deemed so important that such classification has been made mandatory. As has already been pointed out, classification and staggered terms are mandatory for railroad corporations in Illinois. (Ill. Rev. Stat. 1953, chap. 114, par. 8.) Such classification and staggered terms are also mandatory for directors of Federal Reserve Banks (12 U.S.C. 308), Federal Savings and Loan Associations, (Title 24, Code of Federal Regulations, par. 142.9, par. 5 of Chapter K,) and National Farm and Loan Associations (12 U.S.C. 712).

I turn next to that part of the majority opinion which discusses the "purpose sought to be accomplished by the provision" as garnered from excerpts from the constitu-

tional debates and "relevant data in the explanations which appeared in the press." Much of this discussion centers around one individual, Mr. Joseph Medill, publisher of the *Chicago Tribune.*

I do not believe there can be any question but that part of the evil sought to be suppressed by section 3 of article XI was the lack of any minority representation on corporate boards of directors. The object or purpose of section 3 was to provide a method whereby the minorities could have a fair opportunity to obtain representation. Such purpose can be gathered not only from Mr. Medill's statements, editorials and newspaper articles, but from the language of the provision itself.

Actually, other statements of Mr. Medill and articles appearing in the *Chicago Tribune* can be cited which indicate it was not thought that the purpose of section 3 of article XI was to prohibit the then well-known practice of classification of directors and their election for staggered terms and to require that the whole number of directors of a corporation be elected at a regular or annual election. In his speech in the constitutional convention in support of what later became section 3, Mr. Medill said: "I want at least a minority representation in the board of control and that is all that is sought here." Moreover, his comments on the Corporation Act of 1872 show that he approved the act, section 3 of which provided both for cumulative voting and for classification of directors and their election for staggered terms. On April 5, 1872, the next day after the passage of the Corporation Act of 1872 by the General Assembly, the following news article appeared in the *Chicago Tribune:* "Corporations. The bill for the organization of corporations for pecuniary profit has at last passed both houses in a modified form, part of its provisions being taken from the Senate and part from the House bill. It is believed to be generally satisfactory." The following day, April 6, 1872, an editorial appeared in

the *Chicago Tribune* praising the General Assembly for its excellent work, which reads in part as follows: "Adjournment of the Legislature. The State Legislature, it is now announced, has so far completed its business that it will adjourn for the session on Tuesday next. In this connection, it is but an act of simple justice to give it the award of 'Well done, good and faithful servants.' It has not only consummated all the legislation necessary to meet present wants, but it has also left but little legislation to be accomplished for a long time to come. In every respect, it is the most creditable Legislative Assembly which has convened in Illinois for many years." Significantly, on April 9, 1872, the *Chicago Tribune* printed one half of the Corporation Act of 1872 on its editorial page and the next day printed the remainder of the act on its editorial page without criticism or comment.

The foregoing is strong, if not conclusive evidence, that Mr. Joseph Medill, the sponsor of section 3 of article XI of the constitution, did not regard the permission to classify directors and to elect them for staggered terms granted by section 3 of the Corporation Act of 1872 as conflicting in any way with section 3 of article XI of the newly adopted constitution.

Finally, the majority state that cumulative voting and staggered elections are inconsistent and both cannot be given effect. But this could only be true if staggering and cumulating were contradictories or mutually exclusive. They are not inconsistent or incompatible, as both may clearly exist at the same time. Under this statute, where three of a board of nine directors are to be elected, a stockholder may vote cumulatively and give one candidate as many votes as he is entitled to cast, or distribute his votes among as many candidates as he shall think fit. This means that if he can vote 25 per cent of the stock plus one share, he can be certain of electing one of the three. Cumulating and staggering thus coexist. Neither destroys, contradicts nor conflicts with the other. The constitution requires no more.