(No. 38312.—

THE PEOPLE *ex rel.* Gus Giannis, Petitioner, *vs.* CHARLES F. CARPENTIER, Secretary of State, *et al.,* Respondents.

*Opinion filed January 4, 1964.*

House and Underwood, JJ., specially concurring.
Schaefer and Hershey, JJ., dissenting.

William G. Clark, Attorney General, of Springfield, and Gus Giannis, of Chicago, (William C. Wines, Assistant Attorney General, of counsel,) for petitioner.

Don H. Reuben, of Chicago, for respondents.

Mr. Justice Solfisburg delivered the opinion of the court:

This is an original petition for writ of *mandamus* brought by Gus Giannis, a qualified voter, against the State Electoral Board seeking to compel the Board to require all candidates for State Senator in 1964 to be elected at large rather than from the Senatorial districts established by the Reapportionment Act of 1955. (Ill. Rev. Stat. 1955, chap. 46, par. 158—1 *et seq.*; see *Donovan* v. *Holzman,* 8 Ill.2d 87.) Twenty-nine of the Senate's fifty-eight seats will be in contest in 1964.

The legislature failed in 1963 to redistrict the State for the purpose of electing members of the House Representatives because the Governor vetoed the Reapportionment Act passed by the General Assembly (H.B. 978) ; the Redistricting Commission, established pursuant to section 8 of article IV of the constitution, likewise failed to redistrict the House. We, therefore, held in *People ex rel. Spence* v.

*Carpentier, post,* p. 43, decided this day, that the House of Representatives must be elected from the State at large in the 1964 general election.

Three of the members of the Electoral Board—the Governor, the Attorney General and the State Auditor—have appeared by the Attorney General and have adopted petitioner Giannis' position, and will therefore also be referred to as petitioners. They urge that if the House of Representatives must be elected at large, then those who are candidates for the Senate must also be so elected.

The other two members of the Electoral Board—the Secretary of State and the State Treasurer—oppose the petition, and will be referred to as respondents. They contend that even though the House will run at large, the Senate is unaffected and should be elected from the districts established by the Reapportionment Act of 1955.

Because of the conflict among the members of the Electoral Board, and with the consent of the Attorney General, we have appointed separate counsel to represent the Secretary of State and the Treasurer. (Ill. Rev. Stat. 1963, chap. 14, par. 6.) A motion to dismiss has been filed by that counsel, so that the legal issue raised by the petition is presented for decision.

The relevant provisions of article IV of the constitution, as amended in 1954, are sections 6, 7 and 8. Section 6 constitutes the Senate as a body of 58 members who are chosen primarily upon the basis of area. The State is to be divided into 58 Senatorial districts by a legislative redistricting, and this was done by the Reapportionment Act of 1955. Once Senate districts have been established, they are permanently fixed and may not be altered, revised or reallocated except by constitutional amendment. See *Donovan* v. *Holzman,* 8 Ill.2d 87. See also Rall, A Summary of the 1954 Constitutional Amendments, 42 Ill. Law Journal, 509, 509-10 (March, 1954); Witwer and Choka, The Proposed

Reapportionment Amendment, 35 Chicago Bar Record, 323, 324-25 (April, 1954).

Section 7 provides that the House of Representatives is to be composed of three representatives from each of 59 districts throughout the State apportioned on the basis of population. The section contrasts with section 6 in that it provides for periodic redistricting of the House, *i.e.,* in 1955, 1963, and each decade thereafter. House reapportionment is to be accomplished by proportionately allocating the 59 districts among three delineated divisions within the State according to current population.

Section 8 (save for the first sentence) concerns remedial alternatives that are to be employed if legislative redistricting fails. It reads:

"§ 8. In performing its duties under Sections 6 and 7 of this amendment, the General Assembly shall redistrict and reapportion in a single legislative enactment. If, however, the regular session of the General Assembly in 1955 as to both senatorial and representative districts or in 1963, or any ten years thereafter as to representative districts, fails by the first day of July to redistrict the state into such districts, then the redistricting shall be accomplished by a commission. * * *

"This commission shall redistrict the State into senatorial districts and into representative districts in the manner specified above. This commission shall file with the secretary of state a full statement of the numbers of the senatorial and representative districts and their boundaries. No such statement shall be valid unless approved by seven members of such commission.

"After such statement is filed, senators and representatives shall be elected according to the statement and the districts therein determined, until a redistricting and reapportionment are thereafter made by the General Assembly as provided in this amendment. If, however, the statement is

not filed within four months after the commission is appointed it shall stand discharged. Thereupon, all senators, scheduled for election at the next election for state senators, and all state representatives shall be nominated and elected at the next election from the state at large. Following such an election at large, the General Assembly at its next regular session shall perform the duties specified in this amendment. But if such a General Assembly fails to perform these duties, then another commission, as specified in this Section 8, shall be appointed in like manner, with like duties, and power, and with like effect; and so forth until a valid senatorial and representative redistricting and reapportionment are secured in this 1950 decade and each decade thereafter. But there can be only one valid senatorial and representative redistricting and reapportionment during a particular decade."

In construing a constitutional amendment, we must read the amendment as a whole and attribute to each part a meaning that is consistent and harmonious with the amendment's overall intendment and purpose. (*People ex rel. Wellman* v. *Washburn,* 410 Ill. 322; *People ex rel. Chicago Bar Ass'n* v. *Feinberg,* 348 Ill. 549.) Section 8 must thus be read in the context of sections 6 and 7. *Chance* v. *Marion County,* 64 Ill. 66.

The section first directs the General Assembly, in performing its duties under sections 6 and 7, to "redistrict and reapportion in a single legislative enactment." It next directs that the original redistricting and reapportionment of the legislature, and all subsequent redistrictings of the House of Representatives (but not of the Senate) shall be accomplished by a special commission if the legislature fails to redistrict: "If, however, the regular session of the General Assembly in 1955 as to *both* senatorial and representative districts *or in 1963, or any ten years thereafter as to representative districts,* fails by the first day of July to redistrict the state into such districts, *then the redistricting*

*shall be accomplished by a commission."* (Italics supplied.)

Vesting the commission solely with the power to redistrict the House once the Senate has been redistricted comports with the design and structure of the General Assembly established by sections 6 and 7. After the first legislative redistricting of both Houses, sections 6 and 7 contemplate that *only* the House of Representatives' districts shall be changed. Senate districts remain immutable save by constitutional amendment.

The remaining provisions of section 8 must also be read in harmony with sections 6 and 7 and article IV's intended structure of the General Assembly. (See *People ex rel. Nauert* v. *Smith,* 327 Ill. 11; *Chance* v. *Marion County,* 64 Ill. 66.) Such a reading of the section dictates that its references to an election of the Senate at large were meant to become operative *only* if the legislature failed to redistrict the Senate in the first instance in 1955. The language of section 8 was never intended to and does not require Senators to run at large after the initial senatorial redistricting accomplished in 1955.

Our holding is not only consistent with article IV as a whole but it also avoids the anomalous result of a Senate that would be constituted in the 1965-1967 session of the General Assembly with half of its members elected from the State at large and with the other half of its members still representing the districts created by the 1955 Reapportionment Act. Our construction further precludes those voters whose Senators' terms have not yet expired from being given a right to vote for the other 29 members of the Senate. The constitution should whenever possible be construed to avoid such irrational, absurd, or unjust consequences. See *People ex rel. Stickney* v. *Marshall,* 1 Gilm. 672; *People ex rel. Prindable* v. *New York Central Railroad Co.* 397 Ill. 50; *In re Estate of Abell,* 395 Ill. 337; *Harding* v. *Albert,* 373 Ill. 94. See also *Gray* v. *Sanders,* 372 U.S. 368, 9 L. ed. 2d 821.

Petitioners argue that the language of article IV was intended to force the Senate to run at large in the event the House was not redistricted in 1963 as a sanction or threat to force the members of the Senate to perform their duty to pass legislation redistricting the House. Such a strained construction does not meet the test of logic. The Attorney General has conceded in oral argument that such a constitutional reprisal would result in a transient inequality as between Senators, since it would affect only those Senators whose terms happen to expire in 1964. Moreover, if the petitioners' theory were correct, the punishment of an at-large election would be visited upon those Senators who did in fact pass a redistricting bill in 1963. H.B. 978, vetoed by the Governor on July 1, 1963; see *Williams* v. *Kerner, ante.* p. 11.

We do not believe article IV was intended to impose, because House redistricting did not occur, a sanction that would destroy the basic character of the legislature as it is contemplated by article IV. If the House of Representatives runs at large, its character as a House representing population remains unchanged. However, if half the Senate were also to be elected at large, the basic nature of the Senate as envisaged by article IV would be thwarted.

In considering petitioners' argument we have examined various contemporary publications discussing the reapportionment amendment. Some of these, issued by civic groups and of unknown authorship, are of no aid in determining the intent of the constitutional language. None of the materials we have examined indicate any consideration of the question of an election of the Senate at large after the enactment of a valid senatorial reapportionment. We, therefore, conclude that petitioners' reading of the constitution so as to require Senators to now run at large is irreconcilable with article IV, its purpose and its intent.

Petitioners also contend that the senatorial election must be at large if the House so runs, or article IV would

become "discriminatory, invidious and violative of the Fourteenth Amendment to the Constitution of the United States." This allegation, which fails to point out any possibility of actual discrimination, is patently insufficient to raise any Federal question. (See, *e.g.*, *Ellis* v. *Dixon,* 349 U.S. 458, 99 L. ed. 1231; *Bowe* v. *Scott,* 233 U.S. 658, 58 L. ed. 1141.) The gist of petitioners' argument seems to be that the 1954 amendment was intended to assure control of the House to Cook County and control of the Senate to the remainder of the State (see *Donovan* v. *Holzman,* 8 Ill.2d 87). Petitioners apparently believe that an at-large House election could result in Cook County losing a majority of House seats.

While it is true that the 1954 reapportionment amendment was designed primarily to achieve a compromise over control of the General Assembly between Cook County and the remaining 101 counties, it does not follow that if the House must run at large the Senate must do so. We know that Cook County, as of the last official tabulation, had more than 50% of the total population of the State. (United States Census of Population, 1960, Illinois (U.S. Dept. of Commerce, Bureau of the Census).) An at-large election of the House could result in elective control thereof in Cook County; if both Houses were so elected, control of *both* could fall to Cook County. In the last analysis, fruitless speculation as to the possible composition of either house because of an at-large election does not justify changing the basic structure of the legislature as established by article IV.

The writ of *mandamus* is denied.

*Writ denied.*

Mr. JUSTICE HOUSE, specially concurring:

I concur in the result reached in this case for the reasons stated in my dissenting opinions in *People ex rel. Spence* v. *Carpentier, post,* p. 43, and *Williams* v. *Kerner, ante,* p. 11.

Mr. JUSTICE UNDERWOOD, also specially concurring:

For the reasons set forth in my dissents in *Williams* v. *Kerner, ante,* p. 11, and *People ex rel. Spence* v. *Carpentier, post,* p. 43, I also specially concur in the result reached by the majority.

Mr. JUSTICE SCHAEFER, dissenting:

The only question that this case presents is whether or not those State Senators who are scheduled for election in November of 1964 are required by the constitution to be elected from the State at large, along with all State Representatives. The events that give rise to this question are set forth, in part, in our opinion in *Williams* v. *Kerner, ante,* p. 11. Since the opinion in that case was filed, the commission provided by the constitution to redistrict the State has failed to do so within the prescribed four-month period after its appointment, and so, in the language of the constitution, "it stands discharged."

The constitution contemplated that this contingency might occur, and provided that when it did, "Thereupon, all senators, scheduled for election at the next election for state senators, and all state representatives shall be nominated and elected at the next election from the state at large." This plain statement would seem on its face to provide a plain answer to the issue presented. But the respondents contend that its meaning can only be found by reference to sections 6 and 7, and other portions of section 8 of article IV of the constitution. To understand the argument it is necessary to set forth the relevant portions of these three sections:

"§ 6. *The General Assembly in 1955 shall redistrict the state for the purpose of electing state senators. * * * Senators elected in districts bearing even numbers shall be elected in 1956 and every four years thereafter; and senators elected in districts bearing odd numbers shall be elected in 1958 and every four years thereafter.*

"§ 7. *The General Assembly in 1955 and in 1963, and every ten years thereafter, shall redistrict the state for the purpose of electing state representatives.* * * *

"§ 8. *In performing its duties under Sections 6 and 7 of this amendment, the General Assembly shall redistrict and reapportion in a single legislative enactment.* If, however, the regular session of the General Assembly *in 1955 as to both senatorial and representative districts or in 1963, or any ten years thereafter as to representative districts,* fails by the first day of July to redistrict the state into such districts, then the redistricting shall be accomplished by a commission. * * *

*"This commission shall redistrict the state into senatorial districts and into representative districts in the manner specified above.* This commission shall file with the secretary of state a full statement of the numbers of the *senatorial and representative districts* and their boundaries. * * *

*"After such statement is filed, senators and representatives shall be elected according to the statement and the districts therein determined, until a redistricting and reapportionment are thereafter made by the General Assembly as provided in this amendment.* If, however, the statement is not filed within four months after the commission is appointed it shall stand discharged. *Thereupon, all senators, scheduled for election at the next election for state senators, and all state representatives shall be nominated and elected at the next election from the state at large.* * * * But if such a General Assembly fails to perform these duties, then another commission, as specified in this Section 8, shall be appointed in like manner, with like duties, and power, and with like effect; and so forth *until a valid senatorial and representative redistricting and reapportionment are secured in this 1950 decade and each decade thereafter. But there can be only one valid sena-*

*torial and representative redistricting and reapportionment during a particular decade."* (Emphasis as in respondents' brief.)

The main thrust of the respondents' argument is that with respect to senatorial districts the State is to be districted only once, and that those districts, once established, can be changed only by a constitutional amendment. All references to Senatorial redistricting are therefore to be read, so runs the argument, as applying only to the first senatorial redistricting, which took place in 1955. This argument encounters the reference in section 8 to "a valid senatorial and representative redistricting and reapportionment * * * in this 1950 decade and each decade thereafter." That reference, however, does appear to be inconsistent with the second sentence of section 8 which refers to redistricting "in 1955 as to both senatorial and representative districts or in 1963, or any ten years thereafter as to representative districts." There thus appears to be ambiguity as to whether senatorial redistricting as well as house redistricting is required every ten years.

But no one in this case is contending that the Senate should have been redistricted in 1963, and whatever ambiguity may exist as to that question has nothing to do with the issue before us in this case. That narrow issue is whether, when the General Assembly has failed to redistrict, and the constitutional commission has also failed to redistrict, those Senators coming up at the next election, as well as all Representatives, shall be elected at large.

Upon that issue the constitution says: "Thereupon, all senators, scheduled for election at the next election for state senators, and all state representatives shall be nominated and elected at the next election from the state at large." There is no ambiguity as to the purpose or the meaning of this provision. It is a device intended to stimulate the legislators into performance of their constitutional duty to redistrict, and it is equally applicable whether the duty of

the legislators is to redistrict Representative districts only, or to redistrict both Senatorial and Representative districts.

The situation that confronted the State when the constitutional amendment now before us was adopted by the legislature in 1953, and approved by the voters in 1954, is familiar. Since 1901 there had been no revision of legislative districts although the constitution of 1870 commanded a decennial reapportionment. "Such periodic reapportionment has not taken place because of the unwillingness of successive legislatures to transfer seats from downstate Illinois to Cook County in the proportions census figures would make necessary." (Ill. Legislative Council, Publication No. 112, December 1952.) It was therefore important that some device be incorporated in the constitution to insure that future legislators would perform the duties that a constitutional amendment might impose upon them in connection with redistricting.

At the request of the Hon. Walker Butler, then a Senator, the Illinois Legislative Council prepared its publication No. 112 entitled, "Legislative Reapportionment in Illinois." This report to the legislature dealt with the general principles of apportionment and their application in other States and examined "several specific alternatives which may suggest solutions for this state." It dealt also with methods by which future legislators might be compelled or induced to do their duty. With respect to the problem now before us the summary of the report stated: "Apart from the actual plan of apportionment, some states and several Illinois proposals have attempted to assure future periodic reapportionment by delegating this function to an agency other than the legislature itself (*e.g.,* a bipartisan board at the state level, county boards at the local level), by delegating responsibility to a secondary agency if the original agency (typically the legislature) fails to act, by providing for measures which would be unattractive to the legislature such as electing legislators at large, re-

fusing authority to appropriate salaries and expenses for members of the legislature, or calling a constitutional convention for the purpose of apportioning the seats of the legislature. Several states—notably Arizona and Missouri —have provided almost completely automatic processes. which are susceptible to enforcement at each step by the courts, if necessary."

The summary of the report also posed six questions "helpful in highlighting the problems involved in drafting an apportionment amendment to the State Constitution. Each question concerns the choices to be made for the major components of any such amendment here in Illinois." Question No. 6, and its answer, are as follows: "(6) *How can assurance be given of periodic reapportionment in the future?* One amendment proposed in the past would have denied legislators authority to vote their pay and expenses if they failed to reapportion. More commonly, a board of state officers has been suggested to reapportion if the legislature fails to act. It has further been suggested that if an apportionment is not carried out at the prescribed time all legislators should be elected at large at succeeding elections until such action is taken. Another suggestion is that a constitutional convention be elected following failure of the legislature to apportion at the prescribed time and that this body be delegated the responsibility of fulfilling the function. Finally, as has been pointed out, automatic apportionment itself may be provided for in the constitution." Illinois. Legislative Council, Publication 112, p. 28.

The 68th General Assembly, which proposed the amendment to the constitution, was conscious of the need to give assurance of periodic reapportionment in the future. Most of the techniques set forth in the study made by the Illinois Legislative Council were included in one or another of the several reapportionment amendments that were introduced. One of them proposed that if the legislature failed to perform its duty a convention should be elected to redistrict.

(S.J.R. 33; S.J. 1953, p. 1090.) Another provided for redistricting by a board of State officers if the legislature failed to act. (S.J.R. 6; S.J. 1953, p. 60.) A third provided for withholding the pay "of members of the General Assembly that has so failed to act." (H.J.R. 21; H.J. 1953, p. 93.) A fourth, H.J.R. 7, provided for the election at large of all of the members of the Senate and all of the members of the House. (H.J. 1953, p. 49.) The proposal ultimately adopted, S.J.R. 32, contained the present provision for election of one half of the Senators and all of the Representatives from the State at large. S.J. 1953, p. 1089.

The General Assembly that prepared the constitutional amendment in 1953 understood the purpose of the provision now before the court, and expressed that understanding in unmistakable terms. By statute, the General Assembly is directed to prepare a brief explanation of a constitutional amendment that it proposes, and a brief argument in favor of it. (Ill. Rev. Stat. 1963, chap. 7½, par. 4.) House Joint Resolution No. 62 provided for the appointment of a special committee of five Senators and five Representatives to prepare such an explanation and argument. The report of that special committee, and the explanation and argument that it proposed, was approved by both houses of the legislature. (House Journal 1953, pp. 2309, 2312; Senate Journal 1953, p. 2029.) And both the explanation and the argument in favor of the amendment were published by the Secretary of State, as required by law. Ill. Rev. Stat. 1963, chap. 7½, par. 4.

The explanation prepared by the joint committee appeared on the ballot at the referendum election at which the amendment was adopted by the People, immediately above the boxes provided for expression of the voter's choice for or against the amendment.

The complete legislative explanation is as follows, with the portions significant to the decision of this case italicized:

38.

"Explanation of Amendment

"This amendment would direct the General Assembly to redistrict the State for the purpose of electing one Senator from each of 58 senatorial districts and three Representatives from each of 59 representative districts.

"As concerns the Senate, area would be the 'prime consideration' in the formation of the 58 districts. Downstate would be entitled to 34 districts and Cook County to 24 districts, 18 of them in Chicago and six in the county outside Chicago.

"As concerns the House of Representatives, the 59 districts would be based upon equal population as nearly as practical, except that in the redistricting prior to the 1960 census, downstate would be entitled to 29 districts and Cook County to 30 districts, 23 of them in Chicago and seven in the county outside Chicago. The three Representatives from each district would be elected by cumulative voting, as at present.

"Should the General Assembly fail to redistrict as directed, this duty would fall on a commission appointed by the Governor. The State central committees of the two major parties would each submit a list of 10 nominees to the Governor, who would appoint five from each list, making a 10-member commission. *Should the commission fail to redistrict, Senators coming up at the next election and all Representatives would be elected from the State at large. If the resulting General Assembly still failed to redistrict, a new commission would be appointed, as before, and should this second commission fail to redistrict, legislators would again be elected at large—and so forth until a valid redistricting is secured."* House Journal 1953, pp. 2309-2310, Laws of 1953, p. 1928.

The official argument in favor of the amendment contained the following paragraph: "Illinois badly needs a legislative redistricting. The present districts stand as they were created half a century ago. As a result, serious

inequalities of population have developed, not only as between Cook county and downstate, but even within these major areas of the State. The apportionment amendment tends to assure the people of a constitutional districting because if the General Assembly fails to act, a commission is provided; and if the commission fails to act, legislators will be elected at large." House Journal 1953, p. 2310, Laws of 1953, p. 1929.

As stated in *Wolfson* v. *Avery*, 6 Ill.2d 78, 88, "Since the language to be construed is a constitutional provision, the object of inquiry is the understanding of the voters who adopted the instrument." Many organizations urged the adoption of the amendment, and published explanations of its provisions, often in question and answer form. The publication of the Illinois State Chamber of Commerce, for example, said:

"Q. What happens if the legislators refuse to reapportion?

"A. The new Reapportionment Amendment has teeth in it to prevent a repetition of our present situation. Should the legislators fail to fulfill their duty to redistrict, the Governor will then appoint a special redistricting commission of 10 members representing the 2 major parties. Should the commission fail to act, then in a next election and in all succeeding elections until there is compliance, all members of the General Assembly would be required to run at large. This prospect of running at large is so politically uninviting to legislators as to guarantee observance of the new provision."

One of the publications of the League of Women Voters of Illinois contained the following question and answer:

"Q. Can we be sure future legislators will obey the amendment?

"A. If the legislature fails to obey the amendment, then the Governor will act. He is required to appoint a commission of 10 persons (five from each of the 2 major political parties). If this commission fails within four months to draft a new map, then all legislators thereafter seeking office must run 'at large' in statewide elections. This is insurance against future legislatures failing to do their duty, thereby guaranteeing constitutional representative government." 34 Illinois Voter, No. 3, p. 4.

In their brief the respondents say: "At the time the

1954 Blue Ballot Amendment was being proposed, those who had drafted and were advocating its adoption contemporaneously published the intended meaning, import, and effect of the amendment. Those publications make it crystal clear that when the Senatorial districts were fixed in 1955 by the General Assembly, such districts were thereby intended to be established *with finality,* and could not thereafter be disturbed except by constitutional amendment." They then quote the views of Mr. Owen Rall and Mr. Samuel W. Witwer upon that question, which, as has been pointed out, is not before us. Mr. Rall's views upon the question that is before us in this case were stated as follows in the same article from which the respondents quote: "The commission may then redistrict the state * * * failing which the commission stands discharged and all senators and representatives are to be nominated and elected from the state at large. The General Assembly thus elected at large has the duty to redistrict, and if it fails to do so, another commission is appointed. * * * In the meantime, while the legislature and the commission have failed to redistrict, the senators and representatives are to be nominated and elected at large—which is most unlikely ever to occur, but the threat of which gives assurance to any newly populous areas of the future that no legislative stalemate will deprive them of constitutional representation in the lower house." Rall, The 1954 Constitutional Amendments, 42 Ill. Bar Jour. 509, 511.

And upon this question Mr. Witwer stated, again in a different part of the same article cited by respondents: "If the commission fails to so act within four months, it is discharged; and, at the next election and all succeeding elections, until compliance shall have been had with the amendment, all legislators shall run at large in state-wide elections. It is believed that the mere possibility of having to run at large will effectively assure that redistricting will

take place every ten years." Witwer and Choka, The Proposed Reapportionment Amendment, 35 Chicago Bar Record, 323, 325.

Whatever may be the case as to the Senate, the constitution clearly directs decennial redistricting of the House of Representatives. The concurrence of both the Senate and the House is essential to any redistricting. The need for stimulus or sanction to induce compliance with the command of the constitution is no less for the Senate than for the House. The constitution provides the same stimulus —election from the State at large—for both Senate and House, the only difference being that the sanction applies only to one half of the members of the Senate because only one half of that body stands for election every two years. So the constitution provides that "all senators scheduled for election at the next election, and all state representatives" shall be nominated and elected at the next election from the State at large.

The contention of the respondents, that once the Senate has been redistricted its members can never be required to run at large, might make sense if the duties of the Senate, with respect to legislative redistricting, ended with the initial Senate redistricting. But that is not the case. Decennial redistricting, certainly required as to the House, is to be by "legislative enactment" which means that any redistricting bill must be passed by both the Senate and the House. The Senate is not solely responsible for Senate redistricting, nor is the House solely responsible for House redistricting. Unless the Senate, as well as the House, is subjected to the sanction or stimulus of an election at large upon failure to redistrict, the purpose of the General Assembly that submitted the amendment, and of the people who adopted it, is frustrated. For the Senate, simply by inaction, could forever forestall legislative redistricting and force the appointment of a commission with the consequent

threat of an election at large for all House members. That was not the purpose of the amendment and that is not what it says.

"Thereupon, *all senators, scheduled for election at the next election for state senators,* and all state representatives shall be nominated and elected at the next election from the state at large." The respondents contend that the italicized clause must be read out of the constitution, because otherwise one half of the resulting Senate would be composed of Senators elected from districts, and the other half of Senators elected from the State at large. And some voters who had voted for Senators who were elected from districts in 1962, would have the right to vote again for Senators from the State at large in 1964. The respondents argue that this result is absurd, and that the constitution must be construed to avoid it.

It is true that the amendment could have provided a more drastic sanction, and hence perhaps a more effective assurance of future periodic reapportionment, by requiring that all members of the Senate be elected at large, instead of half of them. One of the reapportionment amendment proposals put before the General Assembly in 1953 so provided. (H.J. 1953, p. 49, 50.) This proposal was not adopted, but the fact that the General Assembly chose the milder sanction does not mean that it intended no sanction at all.

The amendment deliberately provided for a Senate of unusual composition in two instances, first during the transition from the old Senatorial districts to the new, and second, in the event of a failure to redistrict. During the transition, one half of the members of the Senate, those elected in 1954 from districts established in 1901, were to remain in office under the amendment until the expiration of their terms in 1958. The other half was to be made up of Senators elected from the new districts required to be established in 1955. That is what occurred, and in the

process, of course, there were voters, who had voted for holdover Senators in 1954, who also voted for Senators from the newly established districts in 1956.

Under the amendment Senators from even-numbered districts were to be elected in 1956, and Senators from odd-numbered districts in 1958. The respondents concede that if there had been a failure to obey the constitution's command to redistrict in 1955, one half of the Senate would have been composed of Senators elected in 1954 from districts fixed under the old constitutional provision and the other half of Senators elected at large under the amendment. Some voters would thus have had the opportunity to vote for a Senator within a district in 1954, and to vote for Senators at large in 1956.

Actually, there was redistricting in 1955, so that this contingency did not then occur. But the General Assembly that submitted the amendment, and the people who adopted it, did not regard the possibility of a Senate of unusual composition as absurd. They deliberately provided for it, and we have already had one such Senate. They were able to contemplate the prospect that is now characterized as absurd with an equanimity induced by the failure of successive legislatures to perform their sworn duties under the constitution.

Mr. JUSTICE HERSHEY joins in this dissent.