Victor D. QUILICI, Plaintiff,

v.

VILLAGE OF MORTON GROVE, Defendant.

Robert STENGL, et al., Plaintiffs,

v.

VILLAGE OF MORTON GROVE, et al., Defendants.

George L. REICHERT, et al., Plaintiffs,

v.

VILLAGE OF MORTON GROVE, Defendant.

Nos. 81 C 3432, 81 C 4086 and 81 C 5071.

United States District Court, N. D. Illinois, E. D.

Dec. 29, 1981.

Victor D. Quilici, pro se.

Robert Gilbert Johnston, Michael Null, Adam Bourgeois, Adam Bourgeois, Ltd., Richard V. Houpt, Sheldon Davidson, Donald J. Moran, Pedersen & Houpt, Chicago, Ill., for plaintiffs.

Martin C. Ashman, Chicago., Ill., Thomas P. Sullivan, Michael H. Salsbury, Eugene R. Wedoff, Jenner & Block, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

This is a civil action challenging the constitutionality of a gun control ordinance passed by the Trustees of the Village of Morton Grove. On June 8, 1981, the Morton Grove Board of Trustees enacted Ordinance # 81–11, entitled "An Ordinance Regulating the Possession of Firearms and Other Dangerous Weapons." (A copy of the ordinance is attached as an appendix.) In part, the ordinance provides that "no person shall possess, in the Village of Morton Grove ... [a]ny handgun, unless the same has been rendered permanently inoperative." The ordinance specifies various limited exceptions for certain individuals, such as peace officers, prison officials, and members of the armed forces and national guard. The ordinance also exempts licensed gun collectors and provides that handgun owners are free to retain their operative handguns for recreational use, as long as the guns are kept and used on the premises of licensed gun clubs and certain other rules are met. Violation of the ordinance is punishable by fines of up to $500.00, and incarceration for up to six months for repeat offenders.

Consolidated here are three civil suits, filed shortly after the enactment of the

1. The four named plaintiffs, Victor D. Quilici, Robert Stengl, George L. Reichert, and Robert E. Metler, all allege that they own handguns as

ordinance, by several residents of Morton Grove.[1] The plaintiffs have alleged that the enforcement of the ordinance, which has been stayed pending this court's ruling on its validity, would violate both the Illinois and United States constitutions. Both sides have moved for summary judgment on the issue of whether the ordinance, on its face, violates article 1, section 22 of the Illinois Constitution, or the Second, Fifth, Ninth or Fourteenth Amendments to the United States Constitution. Because the state constitutional issue is potentially dispositive, the court will first address the validity of Ordinance # 81–11 under the Illinois Constitution.

### The Right to Arms Under the Illinois Constitution

In 1970, a right to arms clause was included in the Illinois Constitution for the first time. Article 1, section 22 provides:

*Right to Arms*

Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed.

The plaintiffs have contended that Morton Grove's ordinance impermissibly infringes upon that right, while the defendant claims that its action represents a valid exercise of the police power. Central to the court's resolution of this controversy is a determination of the meaning of section 22, itself.

Section 22, on its face, requires a reconciliation of two competing notions of individual right and legislative prerogative. On one hand, it clearly recognizes the constitutional right of the individual "to keep and bear arms," and provides that the right "shall not be infringed." Yet, at the same time, the section expressly sanctions "constitutional infringements" of the right pursuant to the "police power," which is generally understood to mean the power of state and local governments to regulate *and even prohibit* conduct which is perceived to be inimical to the safety, health and welfare of society. *People v. Warren,* 11 Ill.2d 420, 424–25, 143 N.E.2d 28 (1957). *Accord,*

defined in the ordinance and would be adversely affected if the ordinance were upheld.

*Drysdale v. Prudden*, 195 N.C. 722, 143 S.E. 530, 536 (1928); *Liquor Control Commission v. City of Calumet City*, 28 Ill.App.3d 279, 283, 328 N.E.2d 153 (1st Dist. 1975).

The plaintiffs have advocated a broad and liberal interpretation of the individual right to keep and bear arms, and a restrictive view of the scope of the police power. That power, they insist, must not be interpreted in a manner which would allow it to circumscribe the individual right contained in section 22. The defendant disagrees. Morton Grove argues that since the individual right in section 22 is made expressly subject to the broad power of the legislature, that right should be construed narrowly, and the police power should be interpreted according to its usual and customary meaning, free from artificially-imposed restrictions. Because the language contained in section 22 itself offers no clue as to the proper reconciliation of these two competing concepts, the court finds it necessary to examine the provision's constitutional history, the source traditionally relied upon for the clarification of ambiguous constitutional provisions. *See Cosentino v. County of Adams*, 82 Ill.2d 565, 46 Ill.Dec. 116, 413 N.E.2d 870 (1980); *Client Follow-Up Co. v. Hynes*, 75 Ill.2d 208, 28 Ill.Dec. 488, 390 N.E.2d 847 (1979); *Wolfson v. Avery*, 6 Ill.2d 78, 126 N.E.2d 701 (1955); *Davis v. Attic Club*, 56 Ill.App.3d 58, 13 Ill.Dec. 811, 371 N.E.2d 903 (1st Dist. 1977).

While it is true that there are several sources upon which one might draw in reviewing the constitutional history of a provision, "the practice of consulting the debates of the members of the convention . . . has long been indulged in by courts as aiding to a true understanding of the meaning of provisions that are thought to be doubtful." *Burke v. Snively*, 208 Ill. 328, 344–45, 70 N.E. 327 (1904), quoted with approval in *Coalition for Political Honesty v. State Board of Elections*, 65 Ill.2d 453, 467, 3 Ill.Dec. 728, 359 N.E.2d 138 (1976); *Wolfson v. Avery*, 6 Ill.2d at 88, 126 N.E.2d 701;

*Davis v. Attic Club*, 56 Ill.App.3d at 67–70, 13 Ill.Dec. 811, 371 N.E.2d 903. In this case, the court has found the delegates' debate on section 22 helpful to a meaningful reconciliation of the individual's right to arms and the state's broad police powers.

Prior to the delegates' floor debate on section 22, the Bill of Rights Committee voted twelve to three to include the following right to arms provision in the new constitution:

> Subject only to the police power of the State, the right of the individual citizen to keep and bear arms shall not be infringed.

Vol. 6, *Record of Proceedings, Sixth Illinois Constitutional Convention* [hereinafter "*Proceedings*"] 84.[2] Leonard Foster, the spokesman for the majority of the committee, was responsible for explaining the provision to the delegates. Although his explanation necessitated a narrow construction of the individual's right to arms, Foster suggested a resolution of the apparent tension between the section's terms. According to Foster, section 22 stood only for the limited right of the individual citizen to keep and bear "some form" of firearm; and as long as the government, in the exercise of its police power, did not totally prohibit the possession of *all* firearms, the right provided for in section 22 was not violated. 3 *Proceedings* at 1687, 1689, 1718 (remarks of delegate Foster).

Although the right to arms described by delegate Foster might have appeared on its face to be evanescent, Foster told the convention that under the 1870 Illinois Constitution, which contained no right to arms provision at all, a total prohibition of firearms was possible, and that the proposed section was designed to do no more than eliminate that possibility:

> It could be argued that, in theory, the legislature now has the right to ban all firearms in the state as far as individual citizens owning them is concerned. That

---

2. In order to avoid any possible question as to whether the police power could be exercised by local governments, the delegates ultimately amended the proposed provision to delete the words "of the State" from the clause "Subject

only to the police power." No challenge has been raised in this case regarding Morton Grove's ability as a local government to exercise that power.

is the power which we wanted to restrict—an absolute ban on all firearms. Nothing further.

3 *Proceedings* at 1688. Later in the debate, Foster emphasized just how limited the proposed right to arms would be:

[S]hort of an absolute and complete ban on the possession of all firearms, this provision would leave the legislature free to regulate the use of firearms in Illinois.

\* \* \* \* \* \*

It is the position of the majority that under the police power of the state, the legislature would have the authority, for example, to forbid all handguns.

3 *Proceedings* at 1718 (order inverted). Foster characterized the committee as "very reluctant" to include any right to arms provision at all in the new constitution, 3 *Proceedings* at 1687, and indicated clearly in his remarks that once the committee finally decided to include such a provision, that provision was intended to be construed narrowly, and fully subject to the broad police power.

During the debate, several of the delegates questioned Foster specifically with respect to the meaning of the term "police power" in the context of section 22, and any limitations which section 22 might impose upon the legislature. Foster was unequivocal: Section 22 would restrain no exercise of the legislature's power short of an absolute ban on all firearms. That statement prompted the following exchange:

MR. FAY: Well, is that the extent of it?

MR. FOSTER: This is the extent of it, Mr. Fay.

\* \* \* \* \* \*

MRS. LEAHY: For a while, I had thought that perhaps the proposal might be a nullity—that you granted the right, but it could be taken away under the police power. According to your answer to the question asked by Mr. Fay, there is one exception to that police power [being] exercised, and that would be the total taking away?

MR. FOSTER: Right.

\* \* \* \* \* \*

MRS. LEAHY: Well, then you have total abolition and total right; and somewhere in between there, there are gradations.

MR. FOSTER: No, we don't have total abolition versus total right. We have total abolition versus limited right—right limited by the police power extending up to but not including total abolition.

MRS. LEAHY: Anything short of total abolition [that] is justified as reasonable for the safety, then, would be approved under your proposal?

MR. FOSTER: Yes, in the opinion of the majority.

3 *Proceedings* at 1688. Clearly, section 22 was presented to the delegates as recognizing a narrow individual right which was subject to substantial legislative control.

From a review of the remarks of the delegates which followed Foster's explanation, it is clear that whatever their individual feelings about the right to arms, there was very little disagreement about the effect of making that right subject to the police power. As the debate progressed, two principal views emerged with respect to the meaning of the right to arms provision in section 22. One group of delegates supported the section, and seemed to adopt the view of the majority of the committee that section 22 represented only a narrow right, and limited virtually no exercise of the police power short of a total ban on all firearms. Typical of this group was delegate Durr:

[H]and guns are by far and away the problem in this country and in this state, where there is a problem with firearms or arms of any kind. This document [Section 22] does not in any way attempt or intend, as I read it and as I suspect the courts would read it—and I've done some research on this—would not restrict the state or the county or the city or any other government within the confines of a reasonable—that is the key word, reasonable—control over hand guns. And I submit to you that that would include the prohibition, if they reasonably determined that hand guns were an undue hazard.

3 *Proceedings* at 1717–18. See also 3 *Proceedings* at 1709 (remarks of delegate Elward: "the plain language of the majority proposal . . . denies almost nothing that the General Assembly or any city council could do in the future.").

A second group of delegates saw little distinction between a limited right to keep "some form" of arms, and no right to arms at all. While in apparent agreement with the committee view that section 22 provided very little protection of an individual's rights in the face of a proper exercise of the police power, this group criticized the majority provision as being totally illusory. *E.g.*, 3 *Proceedings* at 1697 (remarks of delegate Weisberg). Some of those delegates favored no right to arms provision at all, and voted for the minority proposal to exclude any right to arms provision from the constitution. *E.g.*, 3 *Proceedings* at 1713 (remarks of delegate Tomei), 1720 (remarks of delegate Thompson). Others supported a strong constitutional right to arms, and eventually voted for the majority proposal, but only after making it clear to the convention that they felt it too weak. *See* 3 *Proceedings* at 1708 (remarks of delegate Friedrich: "Frankly, I don't think what we're putting in . . . is strong enough. . . . [M]any of [the states] constitutional provisions are much more enabling than the one that's proposed here."); 1704 (remarks of Father Lawlor, proposing, *inter alia*, the removal of the term "police power" from the provision). Most of those delegates acknowledged that the inclusion of the term "police power" substantially undercut the right to arms. To the extent that one looks to the convention debate for assistance in reconciling the conflict between the right to arms and the exercise of the police power, the debate clearly supports a narrow construction of the individual right.

The plaintiffs, in urging the court to reject a narrow construction of the right to arms, have sharply criticized any significant reliance on the constitutional debates. First, they argue that emphasis on the debates is misplaced because the true inquiry in resolving constitutional ambiguities is to determine "the understanding . . . by the voters who, by their vote, have given life to the product of the convention." *Cosentino v. County of Adams*, 82 Ill.2d at 569, 46 Ill.Dec. 116, 413 N.E.2d 870. *See also Client Follow-Up Co. v. Hynes*, 75 Ill.2d at 222, 28 Ill.Dec. 488, 390 N.E.2d 847; *Wolfson v. Avery*, 6 Ill.2d at 88, 126 N.E.2d 701. *But see Winokur v. Rosewell*, 83 Ill.2d 92, 100–102, 46 Ill.Dec. 671, 414 N.E.2d 724 (1980) (relying on framers' intent to clarify ambiguous constitutional provision).[3] To determine the voters' understanding, the plaintiffs have requested the court to consider such additional sources as: (1) The Official Explanation of section 22 which was provided to the voters prior to ratification of the constitution; (2) Newspaper articles written at around the time of the ratification vote discussing the right to arms provisions; and (3) The "plain meaning" which ordinary voters might have attributed to the term "police power." None of those sources, however, meaningfully addresses the reconciliation of individual right and legislative power which section 22 requires.

The "Official Text of the Proposed 1970 Illinois Constitution with Explanation" provides:

Section 22 *Right to Arms*

Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed.

*Explanation*

This new section states that the right of the citizen to keep and bear arms cannot be infringed, except as the exercise of this right may be regulated by appropriate laws to safeguard the welfare of the community.

3. It must be emphasized that the cases relied upon by the plaintiffs do not support outright rejection of the delegates' debate as a source of information, but only suggest the consideration of alternative sources as an aid to resolving constitutional ambiguities. *See Client Follow-Up Co. v. Hynes*, 75 Ill.2d at 220, 28 Ill.Dec. 488, 390 N.E.2d 847: "When the meaning of provisions of the constitution are in doubt, it is appropriate to consult the debates of the delegates to the constitutional convention to ascertain the meaning which they intended to give those provisions." *See also, Wolfson v. Avery*, 6 Ill.2d at 88, 126 N.E.2d 701.

Even taking the "Official Explanation" into consideration, the court is unconvinced of the plaintiffs' position. Far from reconciling the tension between the exercise of the individual right and the exercise of the police power, the above explanation begs the question. Like the text of the section itself, the explanation offers no clue as to the limits on the police power. *See Davis v. Attic Club*, 56 Ill.App.3d at 67, 13 Ill.Dec. 811, 371 N.E.2d 903 (rejecting reliance on the "Official Explanation of the 1970 Proposed Constitution" as being too conclusory and superficial).

Similarly, the court can find no meaningful reconciliation of the two concepts in the Chicago Tribune article of December 13, 1970, which referred to the new right only sketchily as a "new right . . . to keep and bear arms," and summarized section 22 as providing "a guarantee of the individual's right to own firearms." No attention at all is devoted to the critical issue of interpretation as to the limit on the police power.

Finally, the suggestion that the right to arms warrants a liberal reading because that is how "the people" would read it must be rejected. According to this argument, the voters did not understand the full import of the term "police power" when they ratified the constitution. Instead, they most likely thought that they were ratifying a broad right to arms, one which would not tolerate a total handgun ban. Therefore, the plaintiffs argue that the court should give effect to the public's perception of the right rather than its actual meaning. The court cannot agree. Section 22 says explicitly that the individual right is subject to the police power. The Illinois Supreme Court has defined that term to include the power "to prohibit." *People v. Warren*, 11 Ill.2d at 424–25, 143 N.E.2d 28. Sound principles of construction require that "in those instances in which [the Illinois Supreme Court], prior to the adoption of the constitution of 1970, has defined a term found therein, that it be given the same definition, unless it is clearly apparent that some other meaning was intended." *Bridgewater v. Hotz*, 51 Ill.2d 103, 109, 281 N.E.2d 317 (1972). The plaintiffs' arguments to the contrary are incorrect.

The plaintiffs' final attack on the debates concerns the conflict between certain language in the Bill of Rights Committee majority report on section 22 and the position taken by the committee on the floor of the convention. The plaintiffs refer the court to the following language in the report:

The substance of the right [contained in Section 22] is that a citizen has the right to possess and make reasonable use of arms that law-abiding persons commonly employ for purposes of recreation or the protection of person and property. Laws that attempted to ban all possession or use of such arms, or laws that subjected possession or use of such arms to regulations or taxes so onerous that all possession or use was effectively banned, would be invalid."

6 *Proceedings* at 87, *citing People v. Brown*, 253 Mich. 537, 541–42, 235 N.W. 245, 246–47 (1931); *State v. Duke*, 42 Tex. 455, 458 (1875); *In re Brickey*, 8 Idaho 597, 70 P. 609 (1902); *People v. Zerillo*, 219 Mich. 635, 189 N.W. 927 (1922); *State v. Kerner*, 181 N.C. 574, 107 S.E. 222 (1921). The plaintiffs argue first that those cases, decided under other states' constitutions, support their conclusion that the police power should be read restrictively. Second, they argue that the mere fact that those cases were included in the committee report serves as an indication of the delegates' intent that the police power should be narrowly construed, contrary to the intent expressed on the convention floor. The court rejects both of these arguments.

While the language used in some of these cases supports the text used in the report, the cases themselves were decided under distinctly different constitutional provisions. *In re Brickey*, for example, was decided 80 years ago, under a state constitutional provision which stated:

The people have the right to bear arms for security and defense, but the legislature shall regulate the exercise of this right by law.

70 P. at 609. In its opinion in *Brickey*, the Supreme Court of Idaho held only that the inclusion of the term "regulate" in the Ida-

ho Constitution did not permit the legislature to prohibit persons from carrying firearms. *Id.* The framers of the Illinois Constitution did not choose to use the term "regulate" to limit the Illinois right to arms. Instead, they used the expression "subject to the police power," which the Illinois Supreme Court had already held to include the power to prohibit. *See People v. Warren, supra.* In fact, the Illinois Supreme Court had already stated that the police power specifically included the power to prohibit firearms. *Biffer v. City of Chicago,* 278 Ill. 562, 116 N.E. 182 (1917). By including an express police power limitation, the Illinois right to arms provision is simply different from those of the other states.

A further distinction between section 22 and the other provisions is that the Illinois right to arms provision has a clear constitutional history which supports a narrow reading of the right to arms. No such constitutional history is mentioned in the two-paragraph *Brickey* opinion, or in the other cases cited by the plaintiffs. *E.g., State v. Kerner, supra.* For these reasons, the court finds the cases decided under other states' constitutional provisions unpersuasive in this case.

Although the cases decided under other states' constitutions were mentioned in the committee report, little can be concluded merely from the fact of their mention in the report. For, on the very page following its citation of *In re Brickey,* the report quoted with approval the following language from the Illinois Supreme Court opinion in *Biffer v. City of Chicago* :

It is clear, under the authorities, that the sale of deadly weapons may be absolutely prohibited under the police power of the State, and to do this in no way conflicts with the provision of the constitution of the United States and of various state constitutions that "the people have a right to bear arms for their defense and security."

278 Ill. at 570, 116 N.E. 182. 6 *Proceedings* at 88. The majority report then added:

Because arms pose an extraordinary threat to the safety and good order of society, the possession and use of arms is subject to an extraordinary degree of control under the police power.

6 *Proceedings* at 88. Contrary to the plaintiffs' arguments, the views contained in the committee report are certainly consistent with the narrow reading of the right to arms expressed so clearly by the delegates on the floor of the convention.[4] Nothing in the committee report persuades the court to disregard the clear expression of the delegates' intent contained in the debates.

After carefully reviewing the constitutional history of section 22, including the actual language used in the provision, the text of the convention debates, the committee report, and the other sources discussed above, the court concludes that the right to arms in Illinois is so limited by the police power that a ban on handguns does not violate that right. On at least five occasions, the convention debates indicated that such a ban would not be unconstitutional, 3 *Proceedings* at 1687, 1689, 1693, 1718, and the court agrees with that assessment. Furthermore, the court concludes that as long as a law does not totally ban all firearms, it must only qualify as a valid exercise of the police power in order to survive constitutional challenge under section 22. Therefore, the narrow question remaining for the court is whether Morton Grove's enactment was a proper exercise of the police power.

By banning the possession of handguns by private citizens within its borders, Morton Grove has gone further than either the state legislature or any other municipality in gun regulation, either before or after the inclusion of a right to arms in the Illinois Constitution. Therefore, it is necessary to give extremely careful consideration to the permissible limits of the police power as applied to the sweeping provisions of this ordinance.

---

**4.** Similarly, the report's failure to list a handgun ban among its illustrations of such applications of the police power is not necessarily inconsistent with the committee's view during the debate. The report explicitly indicated that its list of illustrations was intended to be nonexhaustive.

Despite the fact that no other court has been called upon to consider a handgun ordinance of this scope, this court, when considering the police power of the state or municipality, is not writing on a blank slate. The Illinois Supreme Court has recently considered and restated the guiding principles by which this court must be led in its review of an enactment under the police power. *See City of Carbondale v. Brewster*, 78 Ill.2d 111, 34 Ill.Dec. 832, 398 N.E.2d 829 (1979), *appeal dismissed*, 446 U.S. 931, 100 S.Ct. 2145, 64 L.Ed.2d 783 (1980). The *Carbondale* court stated the following:

> The police power may be exercised to protect the public health, safety, morals, and general welfare or convenience.... To be a valid exercise of police power, the legislation must bear a reasonable relationship to one of the foregoing interests which is sought to be protected, and the means adopted must constitute a reasonable method to accomplish such objective.... Although the determination of reasonableness is a matter for the court, the legislature has broad discretion to determine not only what the interests of the public welfare require but what measures are necessary to secure such interest.... The court will not disturb a police regulation merely where there is room for a difference of opinion as to its wisdom, necessity and expediency. *Id.* at 114–15, 34 Ill.Dec. 832, 398 N.E.2d 829 (citations omitted).

*See also People v. Haron*, 85 Ill.2d 261, 279–80, 52 Ill.Dec. 625, 422 N.E.2d 627 (1981) ("[T]he standard of a proper exercise of the police power is whether the statute is reasonably designed to remedy the evils which the legislature has determined to be a threat to the public health, safety and general welfare." (citation omitted)).

Certainly, there can be no question that the Morton Grove ordinance is oriented to those interests which are proper aims of any exercise of the state's police power. The preamble to the ordinance demonstrates that the public health and safety were uppermost in the minds of the Trustees of Morton Grove. The preamble states:

> WHEREAS, it has been determined that in order to promote and protect the health and safety and welfare of the public it is necessary to regulate the possession of firearms and other dangerous weapons, and
>
> WHEREAS, the Corporate Authorities of the Village of Morton Grove have found and determined that the easy and convenient availability of certain types of firearms and weapons have increased the potentiality of firearms related deaths and injuries, and
>
> WHEREAS, handguns play a major role in the commission of homicide, aggravated assault, and armed robbery, and accidental injury and death.

The public health and safety are proper police power objectives. Illinois courts have consistently held firearms controls to be within the purview of the police power. *See Brown v. City of Chicago*, 42 Ill.2d 501, 250 N.E.2d 129 (1969) (declaring Chicago firearms registration ordinance valid); *Biffer v. City of Chicago, supra* (declaring Chicago ordinance restricting sale of concealable weapons valid); *Rawlings v. Department of Law Enforcement*, 73 Ill.App.3d 267, 29 Ill.Dec. 333, 391 N.E.2d 758 (3d Dist. 1979) (declaring Illinois statute prohibiting, *inter alia*, former mental patients from obtaining gun licenses to be a valid exercise of the police power); *People v. Williams*, 60 Ill.App.3d 726, 18 Ill.Dec. 132, 377 N.E.2d 285 (1st Dist. 1978) (declaring Illinois concealed weapons statute valid). Here, too, the court concludes that Morton Grove's firearms ordinance is properly related to the public health and safety.

The above finding that the interests sought to be protected by the Trustees of Morton Grove may properly be the targets of an exercise of the police power does not end this court's inquiry. The question remains whether the Morton Grove ordinance, which effectively bans the possession of any handguns, is a reasonable method of promoting the interests of public health and safety.

The plaintiffs suggest in the strongest possible terms that this requirement for a

proper exercise of the police power has not been met here. They argue that the ordinance does not reflect a reasonable response to the problems of weapons misuse, but rather is an arbitrary and simplistic response, resulting in an unreasonable and capricious exercise of the police power.

Morton Grove defends its ordinance as a reasonable legislative response to the very serious problem of handguns in our society, and disputes the characterization of its ordinance as a total prohibition of firearms, or even handguns. By its terms, the ordinance (1) excludes "long guns" such as shot guns and rifles from its proscriptions; (2) exempts certain individuals, such as peace officers, members of the armed forces, and licensed gun collectors, from many of the ordinance's restrictions; and (3) allows the continued recreational use of handguns under certain conditions, at licensed gun clubs. The inclusion of those exceptions, the Village argues, indicates that the Trustees attempted to construct an ordinance broad enough to effectuate its objective of protecting public safety without unnecessarily restricting the possession and use of firearms.

█ In reviewing the reasonableness of Morton Grove's ordinance, it is necessary to recognize certain important limitations on the court's review function. First, it is not the role of the court to test the factual validity of the findings which support an exercise of the police power. That is a uniquely legislative responsibility. The Illinois Supreme Court made this very clear when it ruled on the validity of Chicago's gun registration ordinance in 1969:

> Plaintiffs argue at length that strict gun laws do not tend to reduce crime, and statistics and excerpts from reports of surveys ,are quoted to show that legal restrictions are easily circumvented by experienced criminals.... These arguments, whatever validity they might have, are not appropriately addressed to this court. They relate to matters of legislative instead of judicial concern, and bear on the advisability of the present provisions rather than on their validity."

*Brown v. City of Chicago*, 42 Ill.2d at 507, 250 N.E.2d 129. This court is not free, in reviewing Morton Grove's ordinance, to reexamine and reweigh the evidence upon which the legislative decision was premised.

█ In addition, the court is not to decide whether the means selected by the legislature are the best way to deal with the perceived problem, or whether other alternatives available would have been better. As quoted above, "The court will not disturb a police regulation merely where there is room for a difference of opinion as to its wisdom, necessity, and expediency." *City of Carbondale*, 78 Ill.2d at 115, 34 Ill.Dec. 832, 398 N.E.2d 829. *See Memorial Gardens Assoc. v. Smith*, 16 Ill.2d 116, 156 N.E.2d 587, *appeal dismissed*, 361 U.S. 31, 80 S.Ct. 121, 4 L.Ed.2d 98 (1959); *State Dental Society v. Sutker*, 76 Ill.App.3d 240, 32 Ill.Dec. 67, 395 N.E.2d 14 (1st Dist. 1979), *cert. denied*, 447 U.S. 930, 100 S.Ct. 3029, 65 L.Ed.2d 1124 (1980).

█ The appropriate test is one of arbitrariness. *City of Carbondale*, 78 Ill.2d at 115, 34 Ill.Dec. 832, 398 N.E.2d 829. A prediction that the present ordinance may not be a panacea for all of the problems arising from the possession and use of handguns would not prove the plaintiffs' contention that this ordinance is arbitrary and simplistic. If the present ordinance was adopted on the expectation of the Trustees that it would serve to inch the Morton Grove community one step further to becoming peaceable and safe, this would justify the use of the police power. Many social experiments have only small beginnings.

The issue of whether or not private citizens should be allowed .to possess handguns freely, whether for their own defense or for other purposes, has constantly been in the political arena. Plaintiffs themselves have presented substantial material to this court showing that the question was controversial in England as early as the 1600's. Certainly it was a very important issue in the debates of the Illinois Constitutional Convention, as is shown by the preceding review of those debates. The Trustees of the Village of Morton Grove could not have

been unaware of the existence of the handgun debate.

In addition, the Morton Grove Trustees were entitled to take notice of a recent Illinois case in which the instant provision of the Illinois Constitution was discussed. *People v. Williams, supra,* involved a prosecution under the Illinois Criminal Code for knowing possession within a city of "any loaded pistol, revolver or other firearm." 60 Ill.App.3d at 727, 18 Ill.Dec. 132, 377 N.E.2d 285. An exception in that statute allowed possession by an individual in his own home or place of business. The defendant in that case had in his possession a .32-caliber pistol loaded with four rounds of live ammunition and one spent round. The Illinois Appellate Court had no difficulty in finding that the Criminal Code provision was a reasonable exercise of the police power, because the state had a valid interest in controlling crime within its borders. *See also, Rawlings v. Department of Law Enforcement, supra.*

In addition to controlling crime, the Trustees also stated in the preamble that they were attempting to reduce the incidence of handgun related accidents. The Trustees needed only to read the daily papers to have been aware of the large number of tragic accidents involving the use or misuse of handguns in the home. Furthermore, it cannot be ignored that there is some support for the link between accidental injuries and handguns, specifically. As one commentator observed:

> The handgun—long gun distinction is founded both in the existence of legitimate recreational uses of long guns and on persuasive empirical evidence that long guns are not misused nearly as frequently as handguns."

Comment, *The Impact of State Constitutional Right to Bear Arms Provisions on State Gun Control Legislation,* 38 U.Chi. Rev. 185, 207 (1970). Certainly, the Village has a valid interest in attempting to reduce the possibility of firearms catastrophes in Morton Grove. A ban on the possession of handguns in the home cannot be considered an unreasonable response to that problem, and may in fact be the only method of attaining the goal sought by the Trustees.

In addition to claiming that Morton Grove's exercise of its police power is "arbitrary and simplistic," plaintiffs also argue that the ordinance is invalid because it is a prohibition of the possession of handguns, rather than a regulation of their use. Plaintiffs rely on *In re Brickey, supra,* and *Andrews v. State,* 50 Tenn. 165 (1871), to suggest that the police power does not include the power to prohibit.

That argument by the plaintiffs misstates current Illinois law. As stated above, the police power does include the power to prohibit. "In the exercise of its inherent police power, the legislature may enact laws regulating, restraining *or prohibiting* anything harmful to the welfare of the people, even though such regulation, restraint *or prohibition* interferes with the liberty or property of an individual." *People v. Warren,* 11 Ill.2d at 424–25, 143 N.E.2d 28 (emphasis added). *See Biffer v. City of Chicago, supra; Liquor Control Commission v. City of Calumet City, supra.*

Given that the Morton Grove ordinance is a reasonable response to the problems seen by the Trustees, it is not automatically invalid because it is a prohibition rather than a regulation.

In sum, this court concludes that the Morton Grove ordinance has as its basis the proper goals of protecting the safety and health of the people. In addition, the court finds that the ordinance does not represent a complete ban on firearms, and is reasonable and neither arbitrary nor simplistic. The ordinance was both properly and validly enacted under Morton Grove's police power. Therefore, the court concludes that ordinance # 81–11 does not violate any of the plaintiffs' rights under the Illinois Constitution.

*United States Constitutional Issues*

In addition to their claims under the Illinois State Constitution, the plaintiffs also argue that the Morton Grove ordinance violates the United States Constitution, specifically the Second, Fifth, Ninth and Fourteenth Amendments.

A. *Second and Fourteenth Amendments*

The Second Amendment provides as follows:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

The plaintiffs rely substantially on historical arguments to buttress their contention that the Morton Grove ordinance infringes upon that Amendment. They review (1) the common law background of the right of individuals to possess weapons; (2) the impetus for the Second Amendment, which was the constitutional framers' fear that a national standing army would be inimical to personal rights and liberties; and (3) pre-Civil War judicial decisions in which the individual's right to bear arms was considered. Based on those materials, plaintiffs conclude that the Second Amendment conferred an individual right to keep and bear arms, including handguns, as opposed to a collective right in the states to maintain a militia separate from the federal standing army. After reaching that conclusion, plaintiffs then review the history of the Fourteenth Amendment and suggest that its framers intended that the Second Amendment should apply to the actions of the states.

Defendant Morton Grove's main response to plaintiffs' arguments is extremely simple. The Village points to the Supreme Court's decision in *Presser v. Illinois*, 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886), in which the Court held that the prohibitions of the Second Amendment limited only the power of the United States Congress, and not the power of the individual states. Since this court is bound by the pronouncement of the Supreme Court, the Village argues that plaintiffs' contentions are largely irrelevant. In the alternative, Morton Grove also controverts the specific arguments made by the plaintiffs. The defendant claims that the Second Amendment does not create an individual right, but merely prohibits legislation that would impair the states' right to have a militia. *See, United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). Also, the Village specifically refutes each of the plaintiffs' arguments, contending that they are not supported by common law traditions, the history of the Second Amendment, early state court decisions, or the statements of the framers of the Fourteenth Amendment. While some of those arguments are persuasive, there is no purpose in considering them further in view of the controlling *Presser* decision.

At issue in *Presser* was an Illinois statute which forbade private organizations from parading with arms in any city or town of the state, without a license from the Governor. Presser was convicted and fined for violating the statute. On Appeal to the Supreme Court, Presser claimed that the Illinois provision infringed his Second Amendment right. The Court rejected that argument, stating as follows:

> [A] conclusive answer to the contention that this amendment prohibits the legislation in question lies in the fact that the amendment is a limitation only upon the power of Congress and the National government, and not upon that of the States. It was so held by this court in the case of *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588, in which the Chief Justice, in delivering the judgment of the court, said, that the right of the people to keep and bear arms
>
>> "is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The Second Amendment declares that it shall not be infringed, but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the National government, leaving the people to look for their protection against any violation by their fellow-citizens of the rights it recognizes to what is called in *The City of New York v. Miln*, 11 Pet. [102] 139, [9 L.Ed. 648] the 'powers which relate to merely municipal legislation, or what was perhaps more properly called internal police,' 'not surrendered or restrained' by the Constitution of the United States."

*Id.* 116 U.S. at 265, 6 S.Ct. at 584. The obvious holding of *Presser* is that the Second Amendment was not incorporated into the Fourteenth, and that it does not serve as a check on the power of the state legislature or municipal councils in Illinois.

■ The Supreme Court has never reconsidered its holding in *Presser.* Consequently, that opinion stands as the Supreme Court's most recent pronouncement on the issue of whether the Second Amendment was incorporated into the Fourteenth Amendment so as to limit the power of the states. It is a truism that the district court is bound by the holdings of the Supreme Court to the extent that they bear on questions before the district court. *Hendricks County Rural Electric Membership Corp. v. NLRB*, 627 F.2d 766 (7th Cir. 1980), *rev'd on other grounds,* —— U.S. ——, 102 S.Ct. 216, 70 L.Ed.2d 323 (1981). That rule applies irrespective of the age of the Supreme Court opinion, the district judge's personal opinion of the validity of the Supreme Court's action, or whether he believes the Supreme Court would rule as it did if the issue were again before it. *United States v. Chase*, 281 F.2d 225 (7th Cir. 1960); *Sullivan Outdoor Advertising, Inc. v. Department of Transportation*, 420 F.Supp. 815 (N.D.Ill.1976).

Plaintiffs make two principal arguments in urging that this court not follow the holding in *Presser.*[5] They argue first that *Presser,* when read properly, actually supports, rather than contradicts, their contention that the ordinance is unconstitutional. Second, they claim that irrespective of how *Presser* is read, it is no longer good law; in effect saying that the later cases incorporating several of the first ten amendments into the Fourteenth Amendment overrule *Presser sub silentio.* Neither of those arguments is persuasive.

Plaintiffs seize upon the phrase in *Presser* that "the States cannot, even laying the constitutional provision in question out of

view, prohibit the people from keeping and bearing arms . . .," 116 U.S. at 265, 6 S.Ct. at 584, to support their argument that defendant has misread that decision. When the phrase is read in context, however, it actually supports Morton Grove's position in this case, not the plaintiffs'.

The entire phrase referred to above, from which the plaintiffs have relied on but a portion, reads as follows:

[T]he States cannot, even laying the constitutional provision in question out of view, prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government.

*Id.* Plaintiffs here have not suggested that the Morton Grove ordinance in any way interferes with the ability of the United States to maintain public security, nor could they make an argument to that effect. Irrespective of the Constitutional framers' fear of a national standing army, the United States currently has one and relies upon it, not upon armed private citizens, to maintain public security.

In relying upon the above quoted phrase, plaintiffs also overlook the immediately previous sentence in *Presser,* in which the Supreme Court cites *Mayor of New York v. Miln*, 36 U.S. (11 Pet.) 102, 9 L.Ed. 648 (1837). At the place cited to in *Presser,* the Court in *Miln* said the following:

[A] state has the same undeniable and unlimited jurisdiction over all persons and things, within its territorial limits, as any foreign nation; where that jurisdiction is not surrendered or restrained by the constitution of the United States. That, by virtue of this, it is not only the right, but the bounden and solemn duty of a state, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every

---

5. Plaintiffs' other arguments, urging this court to find that the ordinance infringes the Second Amendment, include claims based on the history of the Fourteenth Amendment, the general change in the viewpoint of the Supreme Court concerning the issue of incorporation, and early

state cases addressing the individual's right to bear arms. Those arguments would require the court, if it accepted them, to reach a decision contrary to the holding in *Presser.* Since this court has no power or authority to do that, the arguments are irrelevant here.

act of legislation, which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called *internal police*, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a state is complete, unqualified and exclusive. 36 U.S. (11 Pet.) at 139, 9 L.Ed. 648 (emphasis in original). Read in context, the phrase referred to by the plaintiffs was not meant to be a limitation on the authority of the states, but merely stated the obvious position that, whenever required by the federal government or absent any regulation whatsoever, an individual has the right to keep and bear arms. Under certain circumstances, that right may be limited by the states through the valid exercise of what has come to be known as the "police power," without fear that any United States Constitutional provisions will be infringed. As was discussed at length above in this court's review of the Illinois Constitution, the Morton Grove ordinance is a valid exercise of the police power. *Presser* requires no more than that.

Plaintiffs' second argument, that *Presser* has been overruled *sub silentio* by later decisions of the Supreme Court is equally unavailing. In their memorandum on this position, plaintiffs rely substantially on Justice Black's dissenting opinion in *Adamson v. California*, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947) (Black, J., dissenting). Although three other Justices concurred with Justice Black that the Bill of Rights, in its entirety, should be incorporated into the protections offered by the Fourteenth Amendment, that position has never been accepted by a majority of the Supreme Court. *See* L. Tribe, *American Constitutional Law* § 11–2 (1978). That situation is underscored by the fact that some provisions of the Bill of Rights, in addition to the Second Amendment, have never been held to apply to the states. *See Watson v. Jago*, 558 F.2d 330 (6th Cir. 1977) (Fifth Amendment right to indictment by a grand jury);

*Iacaponi v. New Amsterdam Casualty Co.*, 258 F.Supp. 880 (W.D.Pa.1966), aff'd, 379 F.2d 311 (3d Cir. 1967), *cert. denied*, 389 U.S. 1054, 88 S.Ct. 802, 19 L.Ed.2d 849 (1968) (Seventh Amendment right to a jury trial in civil cases).

The language in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), quoted by the plaintiffs, is not to the contrary. In that case, the Supreme Court rejected "the notion that the Fourteenth Amendment applies to the States only a 'watered-down, subjective version of the individual guarantees of the Bill of Rights'." 378 U.S. at 10–11, 84 S.Ct. at 1494–1495, (quoting from *Ohio ex rel. Eaton v. Price*, 364 U.S. 263, 275, 80 S.Ct. 1463, 1469, 4 L.Ed.2d 1708 (1960) (Brennan, J., dissenting)). That statement was not intended by the Court to be a wholesale incorporation of the Bill of Rights into the Fourteenth Amendment, but rather to give content to a particular right that had already been incorporated. Justice Harlan's dissent in *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting), also fails to provide any support to plaintiffs here. While Justice Harlan did recognize that the right to keep and bear arms was protected by the Bill of Rights, he was careful to note that the Supreme Court has consistently resisted the notion that the Fourteenth Amendment was merely a shorthand reference to what was set out in the Bill of Rights. *Id.* at 541, 81 S.Ct. at 1775.

*Presser* directly bears on the issue of whether the states or their political subdivisions are limited by the Second Amendment, and it is still good law, notwithstanding plaintiffs' arguments to the contrary. *Presser* controls this court and, therefore, requires it to hold that the Second Amendment does not apply to the states and localities and so is not infringed by the Morton Grove ordinance. Numerous state and lower federal courts who have considered the issue agree with this conclusion. *See Cases v. United States*, 131 F.2d 916 (1st Cir. 1942), *cert. denied*, 319 U.S. 770, 63 S.Ct. 1431, 87 L.Ed. 1718 (1943); *Eckert v. City of Philadelphia*, 329 F.Supp. 845 (E.D.Pa.

1971), *aff'd,* 477 F.2d 610 (3d Cir.), *cert. denied,* 414 U.S. 843, 94 S.Ct. 104, 38 L.Ed.2d 81 (1973); *In re Atkinson,* 291 N.W.2d 396 (Minn.1980); *State v. Amos,* 343 So.2d 166 (La.1977); *Commonwealth v. Davis,* 369 Mass. 886, 343 N.E.2d 847 (1976); *State v. Sanne,* 116 N.H. 583, 364 A.2d 630 (1976); *Harris v. State,* 83 Nev. 404, 432 P.2d 929 (1967); *State v. Swanton,* 129 Ariz. 131, 629 P.2d 98 (Ct.App.1981).

### B.  *Ninth Amendment*

■ The Ninth Amendment to the United States Constitution provides:

> The enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people.

Plaintiffs' arguments under this provision center on a claimed right to self defense. They suggest that the right to bear arms for the purpose of self defense was recognized by several famous natural law philosophers, among them Aristotle, Cicero, and John Locke. Cicero, for instance, noted, "if our lives are endangered by plots or violence or armed robbers or enemies, any and every method of protecting ourselves is morally right." Cicero, *In Defense of Titus Annius Milo,* Selected Political Speeches 222 (M. Grant trans. 1969). In addition, plaintiffs point to several early court decisions under the English common law, which recognized the right of individuals to keep and use weapons for personal defense and defense of the home.

Although plaintiffs' arguments have an understandable facial appeal, the court is unable to accept the argument that this claimed right is protected by the Ninth Amendment.

Neither plaintiffs, the defendant, nor this court has discovered a single instance in which the Supreme Court has explicitly held that a particular right was protected by the Ninth Amendment. In the situations where the Court has given protection to individual rights not explicitly listed in the first ten amendments, it has relied on "penumbras, formed by emanations from those guarantees that help give them life and substance." *Griswold v. Connecticut,*

381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). The only rights so recognized by the Court have involved the truly personal and private rights relating to questions of family and procreation. *See Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Griswold, supra.* Never has the Court recognized anything like a right to self defense, or a right to carry handguns, based either on the penumbra theory or directly under the Ninth Amendment.

The only explicit discussion in any Supreme Court opinion of the Ninth Amendment and its reach appears in the concurrence by Justice Goldberg in *Griswold,* 381 U.S. at 486–99, 85 S.Ct. at 1682–90. Justice Goldberg argued that there were certain fundamental rights, arising from the "traditions and [collective] conscience of our people," *id.* at 493, 85 S.Ct. at 1686 (*quoting Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934)), which required the protection of the Ninth Amendment. Whatever the appeal of such an analysis, Justice Goldberg's thesis has never been accepted by a majority of the Supreme Court. The Ninth Amendment furnishes no support for the plaintiffs' fundamental right argument. The Morton Grove ordinance does not violate its provisions.

### C.  *Fifth Amendment*

Plaintiffs Quilici and Stengl both alleged in their complaints that the Morton Grove ordinance infringed the Fifth Amendment, which prohibits the taking of private property for public use, "without just compensation." Plaintiffs appear to have abandoned that argument, by failing to discuss it in their memoranda of law filed with this court. Nonetheless, for the sake of completeness, the court will address it briefly.

■ It is well established that a Fifth Amendment taking can occur through the exercise of the police power regulating property rights. In order for a regulatory taking to require compensation, however,

the exercise of the police power must result in the destruction of the use and enjoyment of a legitimate private property right. *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *Devines v. Maier*, 665 F.2d 138, No. 80–2315 (7th Cir. November 23, 1981). The Morton Grove ordinance does not go that far. The geographic reach of the ordinance is limited; gun owners who wish to may sell or otherwise dispose of their handguns outside of Morton Grove. *See Fesjian v. Jefferson*, 399 A.2d 861 (D.C.App.1979). If handgun owners do not wish to sell their weapons, they may simply register and store them at a licensed gun club. Finally, the ordinance has an exception for licensed collectors, for whom neither of those two alternatives may be acceptable.

### D. *Vagueness*

In his memorandum, plaintiff Quilici implies that the ordinance is unconstitutionally vague. He suggests specifically that the ordinance's definition of "handgun" as "a firearm of a size which may be concealed upon the person" might apply to shotguns and rifles in an unpredictable manner.

The conditions under which vagueness challenges to a statute may be considered have been clearly set out by the Supreme Court. "It is well-established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975). *See United States v. McCauley*, 601 F.2d 336 (8th Cir. 1979); *United States v. Howard*, 569 F.2d 1331 (5th Cir.), *cert. denied*, 439 U.S. 834, 99 S.Ct. 116, 58 L.Ed.2d 130 (1978). Plaintiff has failed to present an issue of the meaning of the statute as it applies to any weapon possessed by him. Rather, plaintiff, in his complaint, alleges that he owns handguns which are subject to the strictures of the ordinance. It is obvious that the ordinance gives Mr. Quilici "adequate warning" that his conduct would be illegal. *United States v. Powell*, 423 U.S. 87, 93, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1975).

### *Conclusion*

Perhaps the clearest fact that emerges from this litigation is that the issue of gun control, in whatever form, is controversial. Reasonable people can, in good conscience, oppose what Morton Grove has done, while equally reasonable people can fully support this ordinance. Perhaps nowhere else is that situation more clearly demonstrated than in the lengthy and well thought out briefs filed by the opposing parties in this case.

After full consideration, the court has concluded that the Morton Grove ordinance was properly enacted pursuant to the police power, and that it does not infringe upon the rights guaranteed by the United States Constitution. Although those legal questions decided by this court will reach finality at some point in time, the debate over the wisdom of this legislation will continue. Article 1, section 22 of the Illinois Constitution was drafted and presented to the voters of Illinois as a reflection of the conflicting views of the delegates. The voters of Illinois then approved the new Constitution with the express provision that the right to bear arms would be subject to the police power. The Trustees of Morton Grove, also acting in an atmosphere of public debate and conflict, have made a legislative decision that the danger posed by the easy availability of handguns is serious enough to warrant the banning of all handguns within this particular community. Before taking this action, the Morton Grove Trustees must have been aware of the deep-seated conviction of a number of its citizens that they should be permitted to retain handguns for the protection of person and property. The Trustees concluded, however, that the public interest outweighed the claimed personal interests of the opponents of this legislation. The ultimate settlement of this troublesome political question must be returned to the citizens of Morton Grove where it properly belongs rather than in the courts.

For all the reasons stated above, the court finds that the Morton Grove ordinance is valid. It does not infringe any of

the provisions of either the Illinois State Constitution or the United States Constitution. Therefore, defendant's motion for summary judgment is granted, and plaintiffs' motions are denied. The stay precluding enforcement of the ordinance is hereby lifted.

## APPENDIX

### ORDINANCE NO. 81—11

### AN ORDINANCE REGULATING THE POSSESSION OF FIREARMS AND OTHER DANGEROUS WEAPONS

WHEREAS, it has been determined that in order to promote and protect the health and safety and welfare of the public it is necessary to regulate the possession of firearms and other dangerous weapons, and

WHEREAS, the Corporate Authorities of the Village of Morton Grove have found and determined that the easy and convenient availability of certain types of firearms and weapons have increased the potentiality of firearm related deaths and injuries, and

WHEREAS, handguns play a major role in the commission of homicide, aggravated assault, and armed robbery, and accidental injury and death.

NOW, THEREFORE, BE IT ORDAINED BY THE PRESIDENT AND BOARD OF TRUSTEES OF THE VILLAGE OF MORTON GROVE, COOK COUNTY, ILLINOIS, AS FOLLOWS:

SECTION 1: The Corporate Authorities do hereby incorporate the foregoing WHEREAS clauses into this Ordinance, thereby making the findings as hereinabove set forth.

SECTION 2: That Chapter 132 of the Code of Ordinances of the Village of Morton Grove be and is hereby amended by the addition of the following section:

"*Section 132.102.* Weapons Control

(A) *Definitions*:

Firearm: "Firearm" means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas; excluding however:

(1) Any pneumatic gun, spring gun or B–B gun which expels a single globular projectile not exceeding .18 inches in diameter.

(2) Any device used exclusively for signalling or safety and required or recommended by the United States Coast Guard or the Interstate Commerce Commission.

(3) Any device used exclusively for the firing of stud cartridges, explosive rivets or similar industrial ammunition.

(4) An antique firearm (other than a machine gun) which, although designed as a weapon, the Department of Law Enforcement of the State of Illinois finds by reason of the date of its manufacture, value, design and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

' (5) Model rockets designed to propel a model vehicle in a vertical direction.

Handgun: Any firearm which (a) is designed or redesigned or made or remade, and intended to be fired while held in one hand or (b) having a barrel of less than 10 inches in length or (c) a firearm of a size which may be concealed upon the person.

Person: Any individual, corporation, company, association, firm, partnership, club, society or joint stock company.

Handgun Dealer: Any person engaged in the business of (a) selling or renting handguns at wholesale or retail (b) manufacture of handguns (c) repairing handguns or making or fitting special barrels or trigger mechanisms to handguns.

Licensed Firearm Collector: Any person licensed as a collector by the Secretary of the Treasury of the United States under and by virtue of Title 18, United States Code, Section 923.

Licensed Gun Club: A club or organization, organized for the purpose of practicing shooting at targets, licensed by the Village of Morton Grove under Section 90.20 of the Code of Ordinances of the Village of Morton Grove.

(B) *Possession* :

No person shall possess, in the Village of Morton Grove the following:

(1) Any bludgeon, black-jack, slug shot, sand club, sand bag, metal knuckles or any knife, commonly referred to as a switch-blade knife, which has a blade that opens automatically by hand pressure applied to a button, spring, or other device in the handle of the knife; or

(2) Any weapon from which 8 or more shots or bullets may be discharged by a single function of the firing device, any shotgun having one or more barrels less than 18 inches in length, sometimes called a sawed off shotgun or any weapon made from a shotgun, whether by alteration, modification or otherwise, if such weapon, as modified or altered has an overall length of less than 26 inches, or a barrel length of less than 18 inches or any bomb, bomb-shell, grenade, bottle or other container containing an explosive substance of over one-quarter ounce for like purposes, such as, but not limited to black powder bombs and Molotov cocktails or artillery projectiles; or

(3) Any handgun, unless the same has been rendered permanently inoperative.

(C) Subsection B(1) shall not apply to or affect any peace officer.

(D) Subsection B(2) shall not apply to or affect the following:

(1) Peace officers;

(2) Wardens, superintendents and keepers of prisons, penitentiaries, jails and other institutions for the detention of persons accused or convicted of an offense;

(3) Members of the Armed Services or Reserve Forces of the United States or the Illinois National Guard, while in the performance of their official duties; and

(4) Transportation of machine guns to those persons authorized under Subparagraphs (1) and (2) of this subsection to possess machine guns, if the machine guns are broken down in a non-functioning state or not immediately accessible.

(E) Subsection B(3) does not apply to or affect the following:

(1) Peace officers or any person summoned by any peace officer to assist in making arrests or preserving the peace while he is actually engaged in assisting such officer and if such handgun was provided by the peace officer;

(2) Wardens, superintendents and keeper of prisons, penitentiaries, jails and other institutions for the detention of persons accused or convicted of an offense;

(3) Members of the Armed Services or Reserve Forces of the United States or the Illinois National Guard or the Reserve Officers Training Corps. while in the performance of their official duties.

(4) Special Agents employed by a railroad or a public utility to perform police functions; guards of armored car companies; watchmen and security guards actually and regularly employed in the commercial or industrial operation for the protection of persons employed and private property related to such commercial or industrial operation;

(5) Agents and investigators of the Illinois Legislative Investigating Commission authorized by the commission to carry such weapons;

(6) Licensed gun collectors;

(7) Licensed gun clubs provided the gun club has premises from which it operates and maintains possession and control of handguns used by its members, and has procedures and facilities for keeping such handguns in a safe place, under the control of the club's chief officer, at all times when they are not being used for target shooting or other sporting or recreational purposes at the premises of the gun club; and gun club members while such members are using their handguns at the gun club premises;

(8) A possession of an antique firearm;

(9) Transportation of handguns to those persons authorized under Subparagraph 1 through 8 of this subsection to possess handguns, if the handguns are broken down in a non-functioning state or not immediately accessible.

(10) Transportation of handguns by persons from a licensed gun club to another licensed gun club or transportation from a licensed gun club to a gun club outside the limits of Morton Grove; provided however that the transportation is for the purpose of engaging in competitive target shooting or for the purpose of permanently keeping said handgun at such new gun club; and provided further that at all times during such transportation said handgun shall have trigger locks securely fastened to the handgun.

(F) *Penalty*:

(1) Any person violating Section B(1) or B(2) of this Ordinance shall be guilty of a misdemeanor and shall be fined not less than $100.00 nor more than $500.00 or incarcerated for up to six months for each such offense.

(2) Any person violating Section B(3) of this Ordinance shall be guilty of a petty offense and shall be fined no less than $50.00 nor more than $500.00 for such offense. Any person violating Section B(3) of this Ordinance more than one time shall be guilty of a misdemeanor and shall be fined no less than $100.00 nor more than $500.00 or incarcerated for up to six months for each such offense.

(3) Upon conviction of a violation of Section B(1) through B(3) of this Ordinance, any weapon seized shall be confiscated by the trial court and when no longer needed for evidentiary purposes, the court may transfer such weapon to the Morton Grove Police Dept. who shall destroy them.

(G) *Voluntary Delivery to Police Department*

(1) If a person voluntarily and peaceably delivers and abandons to the Morton Grove Police Dept. any weapon mentioned in Sections B(1) through B(3), such delivery shall preclude the arrest and prosecution of such person on a charge of violating any provision of this Ordinance with respect to the weapon voluntarily delivered. Delivery under this section may be made at the headquarters of the police department or by summoning a police officer to the persons residence or place of business. Every weapon to be delivered and abandoned to the police department under this paragraph shall be unloaded and securely wrapped in a package and in the case of delivery to the police headquarters, the package shall be carried in open view. No person who delivers and abandons a weapon under this section shall be required to furnish identification, photographs or fingerprints. No amount of money shall be paid for any weapon delivered or abandoned under this paragraph.

(2) Whenever any weapon is surrendered under this section, the police department shall inquire of all law enforcement agencies whether such weapon is needed as evidence and if the same is not needed as evidence, it shall be destroyed.

(H) All weapons ordered confiscated by the court under the provisions of Section F(3) and all weapons received by the Morton Grove Police Department under and by virtue of Section G shall be held and identified as to owner, where possible, by the Morton Grove Police Department for a period of five years prior to their being destroyed.

(1) *Construction*:

Nothing in this Ordinance shall be construed or applied to necessarily require or excuse non compliance with any provision of the laws of the State of Illinois or to the laws of the United States. This Ordinance and the penalties proscribed for violation hereof, shall not supersede, but shall supplement all statutes of the State of Illinois or of the United States in which similar conduct may be prohibited or regulated.

(J) *Severability*:

If any provisions of this Ordinance or the application thereof to any person or circumstance is held invalid, the remainder of this Ordinance and the applicability of such provision to other persons not similiarly situated or to other circumstances shall not be affected thereby.

**1188** ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

(K) The provisions of this Ordinance shall take effect ninety (90) days from and after its passage, approval and publication in pamphlet form according to law." .

SECTION 3: That this Ordinance shall be published in pamphlet form. Said pamphlet shall be received as evidence of the passage and legal publication of this Ordinance.

PASSED this _____ day of _____, 1981.

Trustee Cashman _____

Trustee Dechert _____

Trustee Hohs _____

Trustee Greenberg _____

Trustee Sneider _____

Trustee Youstra _____

APPROVED by me this _____ day of _____, 1981.

_____
President of the VILLAGE OF MORTON GROVE, Cook County, Illinois.

ATTESTED and FILED in my office this _____ day of _____, 1981, and published in pamphlet form this _____ day of _____, 1981.

_____
Clerk of the VILLAGE OF MORTON GROVE, Cook County, Illinois

Published in pamphlet form this _____ day of _____, 1981, by order of the President and Board of Trustees of the VILLAGE OF MORTON GROVE, Cook County, Illinois.